**RECORD NO. 13-5374**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
### For The District of Columbia Circuit

## WILFRED SAMUEL RATTIGAN,

*Plaintiff – Appellant*,

**v.**

## ERIC H. HOLDER, JR., ATTORNEY GENERAL,

*Defendant – Appellee.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

### BRIEF OF APPELLANT

_____

Jonathan C. Moore
Joshua S. Moskovitz
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0400

*Counsel for Appellant*

James R. Klimaski
KLIMASKI & ASSOCIATES, PC
1625 Massachusetts Avenue, NW, Suite 500
Washington, DC 20036
(202) 296-5600

*Counsel for Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Plaintiff-Appellant Wilfred Samuel Rattigan submits this certificate pursuant to Circuit Rule 28(a)(1):

**A.     Parties and Amici.**  Wilfred Samuel Rattigan was the Plaintiff in the district court and is the Appellant in this Court.  Attorney General John Ashcroft was the original Defendant in the district court; he was substituted by Alberto Gonzalez and later, Eric H. Holder, Jr., who is the Appellee in this Court.

**B.     Rulings Under Review.**   The ruling at issue in this court is Hon. Ellen Segal Huvelle's October 31, 2013 Memorandum Opinion and Order granting Defendant-Appellee's motion for summary judgment.

**C.     Related Cases.**  This case was previously appealed to this Court and docketed under number 10-5014.  The panel in the previous appeal (Rogers, Tatel, Kavanaugh, JJ.) issued two opinions, which are published at 643 F.3d 975 (2011), and 689 F.3d 764 (2012).  Counsel is not aware of a related case—*i.e.*, a case involving substantially the same parties and the same or similar issues—currently pending in this Court or in any other court.

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .................................................................iv

GLOSSARY ..........................................................................................vi

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE................................................................2

    I.    Facts .........................................................................................2

    II.   Procedural History ...............................................................15

SUMMARY OF ARGUMENT ............................................................20

STANDARD OF REVIEW .................................................................23

ARGUMENT .....................................................................................24

    I.    SUMMARY JUDGMENT WAS IMPROPER BECAUSE
        THERE IS SUBSTANTIAL EVIDENCE THAT OIO
        MANAGEMENT COLLUDED WITH OR USED
        LEIGHTON TO MANUFACTURE AND REPORT
        KNOWINGLY FALSE SECURITY CONCERNS
        ABOUT RATTIGAN IN RETALIATION FOR HIS
        PROTECTED CONDUCT ............................................................24

        A.    This Court remanded for the district court to
             determine if there was a triable issue whether
             "Leighton or other OIO officials" referred
             knowingly false information, because the evidence
             showed they colluded to retaliate against Rattigan..................25

# TABLE OF CONTENTS (cont'd)

B.    Ample other evidence, completely overlooked by the district court, shows that the alleged "security concerns" in the EC were knowingly false ...............................34

C.    There is sufficient evidence for a jury to find that the false EC would not have been referred absent a motive to retaliate ......................................................43

D.    The district court erred in deciding that the jury could not determine the real motive for the security referral or Rattigan's damages without second-guessing the Security Division ..................................................49

II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING RATTIGAN THE OPPORTUNITY TO CONDUCT NECESSARY DISCOVERY ABOUT THE KNOWING FALSITIES IN THE SECURITY REPORT, AS THIS COURT HAD INSTRUCTED .............................................54

III.    THE "KNOWINGLY FALSE" STANDARD IS UNWORKABLE, UNNECESSARILY LIMITS IMPORTANT TITLE VII PROTECTIONS, AND PRODUCES PARADOXICAL RESULTS; THE PRESIDENT'S EXECUTIVE ORDER FOR SECURITY REPORTING PROVIDES A BETTER STANDARD ......................58

CONCLUSION ....................................................................................63

CERTIFICATE OF COMPLIANCE ...................................................64

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..............................................23, 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................................23

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013) ...................................23

*Brady v. Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) ...................................34

*Burns-Ramirez v. Napolitano*, 962 F. Supp. 2d 253 (D.D.C. 2013).......................61

*Cason v. S.C. State Ports Auth.*, No. 2:11-cv-2241-RMG,
      2014 U.S. Dist. LEXIS 18708 (D.S.C. Feb. 14, 2014) ..........................46, 49

*Convertino v. U.S. Dep't of Justice*, 684 F.3d 93 (D.C. Cir. 2012).........................23

* *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635 (7th Cir. 2013)...........................48, 49

*Little v. Tech. Specialty Prods. LLC*, No.4:11-CV-717,
      2013 U.S. Dist. LEXIS 152042 (E.D. Tex. Oct. 23, 2013)..........................46

*Ponce v. Billington*, 679 F.3d 840 (D.C. Cir. 2012) ................................................45

* *Rattigan v. Holder*, 643 F.3d 975
      (D.C. Cir. 2011) (*Rattigan I*) ........................................ 1, 2, 14, 16-19, 37, 53

* *Rattigan v. Holder*, 689 F.3d 764
      (D.C. Cir. 2012) (*Rattigan II*)...........1, 2, 14, 16-19, 25, 35, 41, 50, 57, 59-62

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........................44

*Shumate v. Selma City Bd. of Educ.*, No.11-00078-CG-M,
      2013 U.S. Dist. LEXIS 153286 (S.D. Ala. Oct. 24, 2013) ..........................46

* *University of Texas Southwestern Medical Center v. Nassar*,
      133 S. Ct. 2517 (2013)....................................................................21, 44, 45

***\* Authorities upon which we chiefly rely are marked with asterisks.***

iv

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page**

**\*** *Vance v. Ball State University*, 133 S. Ct. 2434 (2013)............................ 20, 26-28

*Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*,
    865 F.2d 320 (D.C. Cir. 1989)........................................................................23

**\*** *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013) ................ 45-46


## Statutes, Rules, and Executive Orders

32 C.F.R. § 147.9 ....................................................................................................5

Executive Order 12,968 ...................................................................... 18, 22, 58-60

Fed. R. App. P. 4 ....................................................................................................1

Fed. R. Civ. P. 56 .............................................................................................23, 54

# GLOSSARY

| Term | Definition |
|------|------------|
| AIU | Analytical Integration Unit |
| ALAT | Assistant Legal Attaché |
| DOJ | Department of Justice |
| EAU | Employee Assistance Unit |
| EC | Electronic Communication |
| EEO | Equal Employment Opportunity |
| FBI | Federal Bureau of Investigation |
| LEGAT | Legal Attaché |
| OIO | Office of International Operations |
| TDY | Temporary Duty Assignment |
| PENTTBOM | Pentagon/Twin Towers Bombing Investigation |

## STATEMENT OF JURISDICTION

The district court's jurisdiction was based on 28 U.S.C. §§ 1331 and 1343 because Appellant's claims arise under federal law.  This Court has jurisdiction under 28 U.S.C. § 1291.  Appellant's notice of appeal from the district court's October 31, 2013 order granting summary judgment on Appellant's only remaining claim, was timely filed on December 11, 2013.  Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

I.     Whether the district court erred in granting summary judgment after remand in *Rattigan v. Holder*, 643 F.3d 975 (2011) (*Rattigan I*), *modified on reh'g*, 689 F.3d 764 (D.C. Cir. 2012) (*Rattigan II*), where Appellant provided substantial evidence that his supervisors colluded to refer "security concerns" they knew to be false in retaliation for his protected activity?

II.     Whether the district court erred in denying Appellant the opportunity to conduct necessary discovery regarding the knowing falsity of facts that were the basis for the retaliatory referral, as this Court had instructed in *Rattigan II*?

III.     Whether the standard announced in *Rattigan II*—that Title VII claims for retaliatory security referrals or reports may proceed only for "knowingly false" reports—is unworkable, and whether the standard in Executive Order 12,298 provides a better standard that would maximize Title VII protection while minimizing any dissuasion to honest security reporting?

1

## STATEMENT OF THE CASE

### I.     Facts

Wilfred Rattigan was born in Jamaica; he is black and Muslim.[1]  He began working for the FBI in 1987 and was transferred to the Bureau's Office of the Legal Attaché in Riyadh, Saudi Arabia in 1999.  The Bureau's Legal Attaché offices are headed by a Legal Attaché ("LEGAT") and an Assistant Legal Attaché ("ALAT"), who are assisted by temporary duty ("TDY") personnel.  LEGATs are responsible for developing intelligence by working with the security services in their host countries.   The FBI's Office of International Operations ("OIO") oversees the Bureau's Legal Attaché offices around the world.  Rattigan served as the ALAT in Riyadh for a short period before he was promoted to LEGAT in 2000.  As LEGAT, Rattigan was the FBI's primary liaison to the Saudi intelligence service, the Mabahith.   Rattigan's ALAT in Riyadh was Gamel Abdel-Hafiz (J.A.190,490-503).  At the time, Rattigan had a bright career ahead of him.[2]

In late 2001, Rattigan's OIO supervisors denied several requests he had made for additional assistance and weapons.  Given the centrality of the Riyadh

---

[1] Citations to the record are omitted for facts recounted in this Court's earlier decisions.  *See Rattigan I*, 643 F.3d at 977-80; *Rattigan II*, 689 F.3d at 765-66.

[2] In 2002, Rattigan was asked to travel throughout the Middle East with FBI Director Robert Mueller, who later called Rattigan at his home to request that he arrange meetings with dignitaries in the region and accompany him on those trips.

office to the FBI's efforts in the Middle East, particularly its investigation of the events of 9/11, Rattigan questioned why his requests were being denied. In October 2001, Rattigan's immediate supervisor, OIO Unit Chief Cary Gleicher, visited the Riyadh office and Rattigan complained to him that he believed Gleicher and OIO Section Chief Michael Pyszczymuka and Deputy Assistant Director Leslie Kaciban had denied Rattigan's requests because of his race and national origin. Rattigan also complained that he believed Gleicher was sent to Riyadh for the same discriminatory reason.

Gleicher reported Rattigan's complaints to Pyszczymuka and Kaciban (J.A.444,446,477,483-84). In late October 2001, Rattigan lodged his complaints with the Equal Employment Opportunity ("EEO") Office, which subsequently conveyed those complaints to Pyszczymuka and Kaciban (J.A.91,519-26).

After his visit to the Riyadh office, Gleicher prepared an Electronic Communication ("EC") recounting his observations of the administration and operation of the office which he provided to Kaciban and Pyszczymuka (J.A.490-503). The EC detailed Rattigan's discrimination complaints against all three OIO supervisors and revealed that Unit Chief Ray had also questioned why OIO management denied Rattigan's requests for resources (J.A.491,493). This version of Gleicher's EC, however, was not uploaded to the FBI system for institution-wide access (J.A.448-49). Rather, a shorter version stripped of all reference to and

3

corroboration of Rattigan's discrimination complaints was uploaded (*compare* J.A.490-503, *with* 504-516; *see also* J.A.353-55,429-30,439-42).  The decision to remove Rattigan's discrimination complaints was made by Pyszczymuka, Kaciban, and Walter Smith, Pyszczymuka's assistant (J.A.427-30,438,447).

Also notably absent from the EC were Gleicher's positive impressions of the Riyadh office.  During his trip to Riyadh, Gleicher had learned that "there was a general feeling of support for Mr. Rattigan and the mission" in Riyadh, and that "everyone in the Riyadh office was supportive of the Pentbomb investigation and it was the number one priority in Riyadh" (J.A.443).[3]  Gleicher had also told Pyszczymuka generally that he approved of the way Rattigan was running the office (J.A.484).  However, none of this information was included in Gleicher's EC (J.A.490-503).

In November 2001, shortly after an EEO counselor began investigating Rattigan's discrimination complaint, Rattigan's supervisors undertook a retaliatory inquisition. Gleicher recruited Special Agent Donovan Leighton for a 21-day assignment to the Riyadh office, which Kaciban approved and Pyszczymuka did not object to, even though they all knew that Leighton had a serious, and unresolved, drinking problem (J.A.431-33,466-67,517-18).  Just months before,

---

[3] PENTTBOM is the acronym for the FBI's investigation of the 9/11 Pentagon/Twin Towers Bombing.

4

Leighton's drinking problem had become so severe that he abandoned his post as the LEGAT in Barbados and went AWOL for more than a week (J.A.396,454-55). Gleicher was Leighton's Unit Chief and was well aware of these events—indeed, when Leighton left Barbados, Gleicher made sure someone met him at the airport to take him directly to a clinic for rehabilitation from the affects of alcoholism (J.A.433-34). Leighton remained in rehab until August 2001, when he returned to his assignment in the OIO supervising a group of agents in the field, including Rattigan (J.A.397). Knowing that Leighton was a security risk, Gleicher—with Kaciban's blessing and Pyszczymuka's silent assent—sent Leighton to Riyadh instead of referring him to the Employee Assistance Program as required for someone with Leighton's condition (J.A.431-32,517-18).[4]

The fact that Leighton was sent to Riyadh to spy on Rattigan in retaliation for his discrimination complaints was apparent. Among other things, before he was deployed, OIO management gave him only the portion of Gleicher's EC that

---

[4] Excessive alcohol consumption, as Pyszczymuka admitted at trial, is a factor in a security clearance (J.A.485). The Government's own regulations warn that "[e]xcessive alcohol consumption . . . increases the risk of unauthorized disclosure of classified information due to carelessness," but such concerns may be mitigated by the successful completion of rehabilitation with aftercare, frequent participation in Alcoholics Anonymous, abstinence from alcohol for at least a year, and a favorable prognosis from a recognized alcohol treatment program. 32 C.F.R. § 147.9(a), (c)(4). OIO management knew that Leighton's drinking problems were recent but did not know whether he had an aftercare plan or was attending Alcoholics Anonymous meetings (J.A.456-58).

was removed from Bureau-wide distribution which detailed Rattigan's discrimination allegations and the confrontation between Gleicher and Rattigan in Riyadh (J.A.409-10,413,491-93). Leighton would not have been able to access that information on his own because only Gleicher, Kaciban, Pyszczymuka (and his assistant Walt Smith), and other OIO management had access to the redacted portions of Gleicher's EC (J.A.449-52). Oddly, this was the only portion of Gleicher's EC that Leighton could recall reviewing (J.A.413). Leighton's behavior while deployed in Riyadh further belied that his true purpose in being there was to gather dirt on Rattigan: As Rattigan explained in his affidavit, "[t]he fact that Leighton, who was a TDYer, was constantly scrutinizing [Rattigan's] actions and fabricating conversations and events instead of focusing on his work, indicates that he was tasked by someone while he was deployed to Riyadh" (J.A.331).

Meanwhile, Rattigan discovered that Pyszczymuka was questioning former Riyadh TDY staff about him in D.C. (J.A.363). Upon her return from Riyadh, Special Agent Beth Babyak was summoned by either Pyszczymuka or Kaciban for a debriefing (J.A.391-92). Pyszczymuka conducted the debriefing, which Babyak described as "unfocused and ambiguous"; according to her, "Pyszczymuka was so vague in his questioning that [Babyak] eventually asked him if he had a specific question for [her] to answer" to which he responded "that he just wanted to know what [she] thought about the operation of the Riyadh office" (J.A.391-92). Babyak

6

told Pyszczymuka that "he needed to trust SSA Rattigan, that [he] was in the best position to know about the workings of [the] Riyadh office and unique problems faced by its personnel" (J.A.392). Babyak "could tell by [Pyszczymuka's] reaction that this comment was not well taken" (J.A.392). Babyak believed Rattigan had an effective liaison relationship with the Saudis, and did not observe anything during her Riyadh assignment that would have led her to conclude Rattigan was being manipulated by the Saudis, or "going over to the other side" (J.A.393).

Leighton completed his tour in Riyadh in late December 2001 (J.A.135). During his time there he never called Gleicher or Pyszczymuka to report any concerns about Rattigan, and before leaving, he did not speak with Gleicher, Pyszczymuka, or Kaciban about his observations in Riyadh (J.A.415-18,459-60,487). When he left Riyadh, Leighton went directly to Florida for a vacation (J.A.398,414-15). He claimed during this litigation that he had developed concerns about Rattigan while he was in Riyadh, but he did not initially report them because, amazingly, he claimed he did not understand "the full enormity of the importance of our office in Saudi Arabia" until he was sitting in a Starbucks on vacation reading a newspaper article that described "the importance of Saudi Arabia in the foreign policy of the United States and its conflict with al-Qaeda" (J.A.113-114,399). Mind you, this was the testimony of a veteran FBI intelligence officer, and former Legat, who was in the FBI at the time of the 9/11 events, and

7

who had spent several weeks in the Riyadh office just months after 9/11. According to Gleicher, who had visited the office shortly before Leighton, the PENTTBOM investigation "was the number one priority in Riyadh," and in the FBI at that time (J.A.443).

In early January 2002, an EEO counselor met with Kaciban, Pyszczymuka, and Gleicher about Rattigan's complaint (J.A.356,523). This set in motion a chain of events which clearly illustrates that the actions taken by Pyszczymuka and his cohorts thereafter were intended to retaliate against Rattigan for his having complained of discrimination. Pyszczymuka was upset, angry, and emotional about Rattigan's allegations; he deemed them outrageous, ludicrous, and embarrassing (J.A.489). Around the same time Rattigan's supervisors met with the EEO counselor, Leighton returned to OIO, and supposedly informed Gleicher of his "concerns" about Rattigan (J.A.416,435,461). Based on what Gleicher reported after his own visit to Riyadh two months before, he did not share Leighton's concerns; nonetheless, he apparently directed Leighton to bring his concerns to Pyszczymuka (J.A.435A-36,462-63).

Although Leighton tried to deny it, the evidence is clear that Leighton and Pyszczymuka met in Pyszczymuka's office for over an hour discussing Leighton's supposed "concerns" about Rattigan (J.A.116-118,478,487). During the entire time they spoke, Pyszczymuka incredibly claimed at trial that he did not ask

Leighton about the support for his allegations (J.A.421). Pyszczymuka directed Leighton to document his concerns in an EC and to forward it to him (J.A.487-88,489A). Pyszczymuka's evasive answers about who decided that Leighton should prepare the EC belied his guilt at being the one who directed Leighton to do so (J.A.477A-477B,487-88,489A) (having initially sworn that he did not direct Leighton to prepare the EC, Pyszczymuka admitted in his deposition that it was his intention that Leighton prepare the EC, and then at trial, he testified "there was concurrence of feeling" that Leighton should prepare the EC).

Despite knowing that the allegations going into the EC were untruthful, Pyszczymuka and the other OIO supervisors decided that the EC should be referred on. Pyszczymuka knew that contrary to Leighton's criticisms, Gleicher approved of the way Rattigan was running the Riyadh office (J.A.484). Pyszczymuka also told Kaciban that Leighton believed Rattigan was too close to the Saudis; yet, Kaciban admitted that he did not agree with this assessment and in fact, approved of Rattigan's management style (J.A.394A-395A). Pyszczymuka had learned from Beth Babyak that Rattigan should be trusted (J.A.392), and he knew everything that Leighton conveyed to him during their lengthy meeting. Nonetheless, despite all of the evidence disproving Leighton's allegations about Rattigan, Kaciban still told Pyszczymuka to have Leighton "proceed through the proper channels" with the EC (J.A.395).

9

At the end of January, while working as an OIO Desk Officer under Gleicher's direct supervision, Leighton began preparing the EC (J.A.88,359,398, 465-66,527-28). Gleicher knew this and in fact, they discussed the issues Leighton was raising while he was drafting the EC (J.A.399,464). Leighton was drinking again during that time, but Gleicher claims he never asked him about this, nor did Pyszczymuka or Kaciban (J.A.422-23,466-67). Leighton provided a completed draft of his EC to Pyszczymuka for review and approval in the middle of March 2002 (J.A.398,404,420,424). Pyszczymuka gave the draft to his assistant, Walter Smith and asked him to review and comment on it (J.A.420,481).

On the same day that Pyszczymuka received the EC, Rattigan alerted him and the other OIO supervisors that Leighton, whose assignment as a Desk Officer involved covering several Legal Attaché offices including Riyadh, had made false allegations about Rattigan and unwarranted critiques of the Riyadh office (J.A.361,536-537). At the time, Rattigan did not know that Leighton had prepared an EC with other false allegations about him (J.A.363). Rattigan sent an email to Gleicher, Pyszczymuka, and Kaciban with the subject, "Complaint against SSA Donovan Leighton" documenting his concerns (J.A.536). Pyszczymuka quickly rebuked Rattigan, emailing back: "[Rattigan] should reserve and keep to himself any comments vis-à-vis SSA Leighton's perceived 'documented failures'" (J.A.541). Rattigan responded, copying Leighton, Gleicher, and Kaciban:

10

> Gentlemen, you have succinctly stated my purpose overseas. Now, why does there appear to be a concerted effort to rebuke me and stymie my efforts? I know why, and it is as obvious as the color of my skin. Rest assured that I will neither falter nor rest in my quest to **<u>fully</u>** exhaust my administrative and legal remedies.

(J.A.545 (emphasis in original); *see also* J.A.362-63). Both Pyszczymuka and Kaciban wrote back acknowledging they had read Rattigan's email (J.A.531-32,543-45). As discussed further in Point I.B *infra*, these emails are significant in that they establish with documentary proof that Gleicher, Pyszczymuka, and Kaciban knew specific allegations included in the EC were false.

While these messages were being exchanged, Smith returned the EC to Pyszczymuka with handwritten comments on it (J.A.408,421,481), and a note addressed to Pyszczymuka and Kaciban which read:

> I've gone over the EC and think it is much too long, and in some cases, inflammatory and unsupported in fact-innuendo, hearsay, etc. The exposition-importance of [Saudi Arabia], trading, etc. is unnecessary in light of 9/11/01. However, there are a number of issues within, other than management. First and foremost, the allegation of fraternization with FNs [Foreign Nationals] and sexual relations with same. Second, this should be paired with Rattigan's response-especially his absence from Legat office for xxx weeks-he seems to justify that in his e-mail. The rest is a management issue, and we have to live with [Gleicher]'s write up-**recent** write up.
>
> I would suggest that [Leighton] does redacted/edited EC to FO [Front Office, "the office of Mr. Kaciban and Mr. Pyszczymuka"], and that we do cover EC and refer to OPR/Security for their review.

(J.A.548-49) (emphasis in original). "Rattigan's response" that Smith referred to—a communication in which Rattigan informed his OIO supervisors that he had been out of the office due to an illness—was never included with the EC (J.A.417).

The EC with Smith's handwritten revisions and his note were returned to Leighton (J.A.109-118,404,398,481). Leighton also received a note from Pyszczymuka directing him to address the EC to the Security Division and thanking Leighton for his "efforts in documenting the observations made by you in Riyadh" (J.A.550-63; *see also* J.A.404-05,421,481). Leighton originally intended to refer the EC to the Employee Assistance Unit ("EAU"), which assists employees confidentially with personal issues and concerns (J.A.393,417-18). At trial, in a transparent attempt to harmonize his testimony with that of Pyszczymuka, Leighton claimed that he actually intended to refer his allegations to the Security Division for an evaluation of various issues, including performance, security, and employee assistance (J.A.400,403-404,417). However, Pyszczymuka admitted that he directed Leighton to refer the EC to the Security Division (J.A.478,483).

Leighton made the directed changes, but many of the inflammatory allegations and innuendo that Smith pointed out to Pyszczymuka remained in the EC (J.A.405,421). The final, revised version of the EC, dated April 2, 2002, makes no mention of an EAU or multidisciplinary evaluation, stating instead that "SSA Leighton recommends that the above information be referred to the Security

12

Division to conduct an evaluation to determine whether a security risk is presented" (J.A.135,152,406,418). Leighton gave the final version of the EC to Pyszczymuka for his review and approval (J.A.488; *see also* J.A.407,482). Neither Pyszczymuka, Gleicher, nor anyone else from OIO discussed Leighton's allegations with Rattigan or with any of the other numerous FBI agents who had performed worked in Riyadh during the relevant period (J.A.366).

Ten days after receiving the final revised EC, Pyszczymuka forwarded it to the Security Division with a note that "Rattigan has commenced an EEO process versus OIO" and naming individually himself, Gleicher, and Kaciban (J.A.564-66). Pyszczymuka's note also "request[ed] that [the Division] conduct an appropriate review of SSA Leighton's observations" (J.A.564-66). The final version of the EC that Pyszczymuka referred falsely alleged, among other things:

> (1) that Rattigan occasionally wore Saudi national clothing he had received as a gift from the Saudi security service, creating the impression he had "gone native," (2) that Rattigan's Saudi colleagues were attempting to find him a "suitable wife," (3) that Rattigan hosted wild parties attended by other agents and by female "nurses," a term that might have "be[en] used by . . . Rattigan as a euphemism for 'prostitutes,'" (4) that Rattigan and his assistant, Abdel-Hafiz, were inattentive to the FBI's investigation of the September 11 attacks, (5) that Rattigan took an extended absence to make a pilgrimage to Mecca [for the holy week of Hajj] along with Abdel-Hafiz and their Saudi counterparts during which he [left no one in charge and no contact information and] could be contacted only through the Saudi security service, and (6) that Rattigan refused to allow temporary duty staff to interact directly with the Saudi security service.

13

*Rattigan II*, 643 F.3d at 978-79 (alteration in original) (quoting J.A.134-152).

Pyszczymuka knew that the referral would result in an investigation (J.A.483). The Security Division interviewed more than a dozen TDY employees previously assigned to the Riyadh office, including Leighton (J.A.189-90). The Division's report concluded that "the potential risks to FBI security and information, as documented" in the EC referred by Pyszczymuka were "unfounded." Among other things, the investigation found that some TDY personnel were allowed to accompany Rattigan or Abdel-Hafiz on meetings with the Mabahith (J.A.191). The Division's report also noted that the investigation disproved the allegations about wild parties with prostitutes; the women were actual nurses who attended social events at diplomatic residences (J.A.193). The Divisdion also reported that there was no support for the allegation that Rattigan was too close with his counterparts in the Mabahith; that "[i]nterviews . . . did not support SSA Leighton's assertion that neither ALAT Abdel-Hafiz nor Legat Rattigan designated a point of contact for the Legat office during their absence" for Hajj; and that when Leighton contacted the Riyadh Office during Hajj, Agent Culligan "advised [him] that [Culligan] was designated as the point of contact" and Rattigan contacted Leighton "approximately three hours later" (J.A.191-92).

A subsequent report by the Analytical Integration Unit ("AIU") confirmed these findings. Among other things, the report noted that "[n]one of the personnel

14

interviewed could offer any information which would support [Leighton's] allegation that [Rattigan], along with several other TDY personnel, engaged in sexual relations with these women" (J.A.570). The AIU report also rejected as baseless the allegation that Rattigan attempted to prevent TDY personnel from interacting with the Mabahith (J.A.570). The AIU concluded that there was "no security risk present relative to the issues of allegiance, foreign influence, or personal conduct on the part of" Rattigan, and the "assertions that [Rattigan] was ineffective in his administration of the office, and that he appeared detached and uninvolved in the Penttbomb investigation, lack[ed] corroboration and [were] unfounded" (J.A.571). All of these facts, of course, were known to the management of OIO before they made the referral. The investigation of Rattigan was closed, but the damage to his reputation and career continues.[5]

## II.   Procedural History

Rattigan filed this lawsuit in 2004. In 2009, the district court finally allowed the Title VII retaliation claim to go to trial. The jury found that the referral of the EC to the Security Division was the result of unlawful retaliation. On appeal, this Court twice rejected the Government's arguments for dismissing Rattigan's claim.

---

[5] Although not a part of the record below, since the trial in this matter in 2009, Rattigan has applied for fifty-six openings with the FBI, all of which he was eminently qualified for, but has been turned down each and every time.

*Rattigan v. Holder* (*Rattigan I*), 643 F.3d 975 (D.C. Cir. 2011), *modified on reh'g*, 689 F.3d 764 (D.C. Cir. 2012) (*Rattigan II*).

In *Rattigan I*, Judge Tatel, joined by Judge Rogers (Judge Kavanaugh filed a dissenting opinion), upheld the district court's conclusion that Rattigan's claim was justiciable under *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988), because it did not depend on "calling into question unreviewable security decisions."  643 F.3d at 978.  The majority held that "*Egan* shields from review only those security decisions made by the FBI's Security Division, not the actions of thousands of other FBI employees who, like Rattigan's OIO supervisors, may from time to time refer matters to the Division," and "nothing about [Rattigan's] claim required him to attribute retaliatory animus to Security Division employees."  *Id.* at 983-84.

However, the panel faulted the district court for "allow[ing] the jury to review the decisions of the Security Division itself."  *Id.* at 985.  The majority instead explained that "the OIO referral can qualify as a materially adverse action under Title VII," because "a reasonable jury could find that OIO's security referral itself might well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.* (quotation marks omitted).  "Moreover, this conclusion depends not at all on the actions that the Security Division takes: the possible negative repercussions of an OIO referral could deter an employee from filing a complaint even though OIO has no control over whether the Security Division

16

undertakes an investigation or ultimately decides to revoke a security clearance." *Id.* at 987.

Accordingly, the panel remanded "to give Rattigan an opportunity to prove his case, and offered two non-exclusive paths that would avoid *Egan*. *Id.* First, the panel said Rattigan "may be able to introduce evidence to convince the jury that those employees included in their referral accusations that they knew or should have known were false or misleading." *Id.* at 988. Alternatively, "the district court could . . . instruct the jury to assume that the reasons the Division gave for commencing an investigation—provided those reasons did not rest on false or misleading allegations—fully justified undertaking the investigation." *Id.* at 989. The Court remanded for the district court "to decide whether, given the record and any cautionary instructions and evidentiary rulings it believes necessary, Rattigan's case can go forward without putting the jury in the position of second-guessing the Security Division." *Id.*

The Government sought rehearing on two points. First, it pressed the argument that *Egan* barred a claim based on the EC referral, which the panel again rejected: "[W]e adhere to our holding that *Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns." *Rattigan II*, 689 F.3d at 767-68.

17

Second, the Government argued that "preserving Title VII liability for security reporting claims will impair the ability of the Security Division to fulfill its" duties to make security clearance decisions under Executive Order 12,968, which requires employees to report "'any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security.'" *Id.* (quoting Exec. Order No. 12,968 § 6.2(b)).  The panel accepted the proposition that "by imposing a standard for Title VII liability that conflicts with the reporting standard set forth in Executive Order 12,968, [*Rattigan I*] creates a risk that an employee's compliance with the Order could provide a basis for Title VII liability." *Id.*

The panel, however, refused to "bar reporting and referral claims altogether," as the Government sought.  Instead, it reaffirmed that "it is [the Court's] duty not only to follow *Egan*, but also to 'preserv[e] to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation." *Id.* at 770 (quoting *Rattigan I*, 643 F.3d at 984).  In an effort to achieve that balance, the panel held that "claims of knowingly false security reports or referrals can coexist with *Egan* and the Executive Order." *Id.* According to the panel, this new standard depends on "whether the reporting employee actually knew at the time of the reporting that the information he provided was actually false." *Id.*

18

The Government argued that remand was unnecessary because even if the security concerns in the EC were contrived, their factual premises were true and there was no evidence of knowing falsity in the referral.  *Id.* at 772.  The panel rejected this argument because a "review of the record suggests that there may be evidence to support a claim that Leighton or other OIO officials chose to report other information that they knew to be false."  *Id.*  Specifically:

> Rattigan may be able to prove that (1) no one "told" Leighton that Rattigan hosted parties in which he and others engaged in sexual relations with "nurses," and that (2) because Leighton and other OIO officials knew that Rattigan's girlfriend and her co-workers were in fact nurses, the claim that circumstances suggested they might instead be prostitutes was knowingly false.

*Id.* at 773.

The obvious implication of singling out certain false statements was that not all of the information in the referral needed to be false for Rattigan's claim to proceed.  *Id.*  Thus, it appeared fairly clear that a new trial was inevitable, and the panel instructed the district court to proceed on remand as follows:

> Because we set forth this knowingly false standard for the first time on appeal, Rattigan had little reason to thoroughly develop evidence of knowing falsity in the district court.  Given this, and given that the record contains some evidence that could form the basis for a claim of knowingly false security reports, we shall remand for the district court, after permitting any necessary discovery, to determine in the first instance whether there is sufficient evidence of knowing falsity to allow Rattigan to bring his claim before a jury.

*Id.*

19

Acknowledging that it had been instructed to allow "limited discovery on the falsity of the allegations of the EC" (J.A.58), the district court instead welcomed an immediate summary judgment motion (J.A.64). Rattigan opposed the motion as best he could without any additional discovery, marshalling substantial evidence of knowing falsity. He explained that he needed additional discovery, as this Court said, "to thoroughly develop evidence of knowing falsity." The district court denied Rattigan's request for discovery and granted summary judgment for the Government, ignoring nearly all of the evidence showing knowing falsity (including a detailed affidavit of Mr. Rattigan, which the district court never once mentioned), sidestepping this Court's prior decisions in this case, and misapplying fundamental legal principles. Rattigan timely appealed (J.A.634).

## SUMMARY OF ARGUMENT

**I.**     Summary judgment was improper because there was ample evidence that OIO management retaliated against Rattigan by referring allegations to the Security Division that they knew were false. The district court mistakenly rejected consideration of all evidence that Leighton knew the EC's allegations were false because it found he was not a "supervisor" as defined in *Vance v. Ball State University*, 133 S. Ct. 2434 (2013). Even if *Vance* were applicable to this retaliation case, which it is not, the court overlooked substantial evidence that OIO management colluded with Leighton to prepare and refer the EC. The district

court misapplied *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), to hold that because there was factually true statements in the EC, Rattigan could not show that retaliation was the "but-for" cause the EC was referred. This mistakenly assumes the ultimate issue in this case, *i.e.*, that the EC would have been referred absent a motive to retaliate. *Nassar* did not hold that an employer is insulated from liability so long as it weaves a non-retaliatory excuse into its illegal conduct. Instead, *Nassar* held that liability depends on a jury finding that the adverse action would not have occurred absent a desire to retaliate, which, as the Second Circuit has recognized, does not mean that retaliation had to be the sole cause of the adverse action. There is ample evidence here for a jury to find that the EC would not have been referred to the Security Division if Pyszczymuka and his cohorts in OIO did not intend to retaliate against Rattigan.

II.    The district court improperly granted summary judgment for the Government without permitting Rattigan any of the tailored discovery that he requested, and which this Court said he should be permitted. Rattigan requested the deposition of certain OIO supervisors and further discovery about Leighton to show that OIO management colluded with or used Leighton, as Leighton had himself suggested, and knew the report were false. These are precisely the issues that *Rattigan II* instructed the district court to allow Rattigan to explore on remand.

21

**III.**   The knowingly false standard is unworkable because it divorces the factual basis of a security referral from its context.   It matters whether the referral—even if the underlying facts are true—is based on an actual security concern.   Executive Order 12,968, which sets forth the President's directive on security referrals, recognizes this point.   It does not direct the reporting of any true information, but only "information *that raises doubts* as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security."   The knowingly-false standard unnecessarily deprives dutiful federal employees like Rattigan of important protections against discrimination and retaliation.   The knowingly-false standard has also produced paradoxical results.   A workable alternative standard for non-justiciable claims is found in Executive Order 12,968; that would shield from Title VII liability reporting of information that raises doubts as to whether another employee's continued eligibility for access to classified information.   The President has not deemed true information that does not raise doubts about access to classified information to be necessary for security clearance decisions, and inaccurate security reports are already punishable by internal agency rules.   Therefore, a claim based on the reporting of information that does not raise doubts about a security clearance harmonizes with the President's Executive Order and will not interfere with the reporting of information needed for security clearance decisions.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). The movant bears the burden to establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989) ("Summary judgment is appropriate only in circumstances where 'the evidence is such that a reasonable jury could not return a verdict for the nonmoving party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))). In considering the motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

This Court reviews the denial of a request for discovery to oppose summary judgment for abuse of discretion. Federal Rule of Civil Procedure 56(d) permits "a nonmovant [to] show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." "While the district court enjoys broad discretion . . . summary judgment is premature unless all parties have had a full opportunity to conduct discovery." *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quotation marks and citation omitted). "A Rule 56[d] motion requesting time for additional discovery should be granted

almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Id.* (quotation marks omitted).

**ARGUMENT**

I.  **SUMMARY JUDGMENT WAS IMPROPER BECAUSE THERE IS SUBSTANTIAL EVIDENCE THAT OIO MANAGEMENT COLLUDED WITH OR USED LEIGHTON TO MANUFACTURE AND REPORT KNOWINGLY FALSE SECURITY CONCERNS ABOUT RATTIGAN IN RETALIATION FOR HIS PROTECTED CONDUCT**

The evidence Rattigan submitted below was more than enough for a jury to find that OIO management colluded with or used Leighton to refer allegations they knew to be false. The district court failed to view this evidence in a light most favorable to Rattigan and ignored other evidence—including Rattigan's sworn exegesis of the EC's false statements—which was highly probative of the fact that Leighton *and* Rattigan's OIO supervisors knew the EC's allegations and security concerns were false.[6] Instead of confronting this evidence, the district court

---

[6] The unfairness of what happened to Rattigan on remand could not be more apparent from the district court's refusal to consider any of the facts submitted in Rattigan's affidavit showing the knowing falsities in the EC. Because this Court adopted a new standard in *Rattigan II*, Rattigan was obviously not in a position during the prior trial to discuss evidence with the knowingly false standard in mind. On remand, as directed by this Court, Rattigan sought discovery on the allegations in the EC to demonstrate that they were knowingly false and that OIO supervisors, including Gleicher, Pyszczymuka, Smith, and Kaciban, were aware of this. Yet, not only did the district court deny Rattigan additional discovery on remand, it totally ignored his detailed affidavit submitted in opposition to summary judgment which attempted to put all these allegations in their proper context.

24

sidestepped the primary issue that this Court had remanded for it to determine, *viz.*, whether there was sufficient evidence for a reasonable jury to find that Rattigan's supervisors or Leighton referred knowingly false accusations in retaliation for Rattigan's protected conduct.  The district court also mistakenly concluded that the jury could not decide the real motive for the referral of the EC or Rattigan's damages without questioning the Security Division's decision making; but that conclusion effectively disregards the core holding of *Rattigan I* and *II* and unnecessarily injects the Division's decisions into the jury's deliberations when that could easily be avoided through a simple jury instruction.

### A. This Court remanded for the district court to determine if there was a triable issue whether "Leighton or other OIO officials" referred knowingly false information, because the evidence showed they colluded to retaliate against Rattigan.

The district court erred in discounting entirely Rattigan's evidence and arguments that Leighton knew the allegations in the EC were false (J.A.623 n.9) ("[I]t is unnecessary to consider the specific allegations of Leighton's knowing falsity described in [Rattigan's] opposition.").  This ignores the Court's mandate in *Rattigan II* to the district court to determine, after permitting additional discovery "whether the record evidence is sufficient to allow a reasonable jury to conclude that *Leighton or his OIO supervisors* knowingly reported or referred false factual allegations to the Security Division."  689 F.3d at 773 (emphasis added).

25

The district court's reasoning was based in part on its flawed application of *Vance v. Ball State University*, 133 S. Ct. 2434 (2013), but also on the court's failure to view the evidence in the light most favorable to Rattigan and refusal to consider evidence that Leighton was acting in concert with or being used by Rattigan's OIO supervisors. There is ample circumstantial evidence—including a lengthy meeting between Leighton and Pyszczymuka, akin to the evidence in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), and obviously deceptive answers about that meeting at trial—from which a jury can find that they had a meeting of the minds about the allegations in the EC. As such, the district court erred in failing to accept that Gleicher, Pyszczymuka, Smith, and Kaciban colluded with Leighton. Viewed properly in Rattigan's favor on summary judgment, it is critical that Leighton knew the EC allegations were false because it makes it more likely that his collaborators shared that knowledge.

The district court mistakenly concluded that *Vance* superseded the question *Rattigan II* ordered it to consider on remand, *viz.*, whether there was sufficient evidence that "Leighton or his OIO supervisors" knowingly reported or referred false factual allegations to the Security Division. The court reasoned that to establish vicarious liability for Rattigan's employer under *Vance* the knowingly-false referral must have been made by a "supervisor," *i.e.*, an employee who possesses authority to take tangible employment actions (J.A.618-19). The court

26

decided that Leighton was not such a supervisor and therefore it mattered not at all if he knew the facts in the EC were false (J.A.619-20,623 n.9). In the district court's view, Pyszczymuka was the only relevant supervisor and he merely referred Leighton's EC without knowing if any of the allegations were true or not (J.A.619-20). These conclusions are fatally flawed.

As an initial matter, it is doubtful that *Vance* applies to this retaliation case. The Court's opinion and holding were limited to harassment claims. *Id.* at 2439, 2443 ("We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim . . . ."). Unlawful retaliation, and the different issues that it encompasses, was never addressed in *Vance*.

The district court recognized that *Vance* "concerned a hostile work environment claim, not a retaliation claim," but disregarded this distinction because *Vance* referred once to "liability under Title VII" without limiting it to harassment claims only (J.A.619 n.4). This is surely weak support for applying a decision that rests on the nuanced and specialized law of hostile workplace claims to the much different situation of retaliation claims. The rule in harassment cases is that an employer is not vicariously liable under traditional tort principles for harassment carried out by a non-supervisor (unless the employer is negligent) because such conduct is not within the scope of an employee's duties; a supervisor,

27

on the other hand, is "aided in accomplishing the tort by the existence of the agency relation," *i.e.*, because the employer has empowered the supervisor with authority, and the employer can be held vicariously liable. *Id.* at 2441-42. In the retaliation context, the supervisor/non-supervisor distinction looses significance because both are "aided in accomplishing the tort by the existence of the agency relation" where the employee retaliates through an employer-approved process such as a security referral.

Even if, *arguendo*, *Vance* applied here, there are significant flaws in the district court's analysis. First, the court found that Leighton was not Rattigan's "supervisor" as that term was defined in *Vance* because at earlier stages of this litigation, Rattigan stated that Leighton was not his supervisor. Those statements were made long before *Vance* was decided and thus, did not admit a definition of the term that had not yet been adopted. Consequently, it was error for the district court to find as a matter of fact that Leighton was not Rattigan's "supervisor."

More importantly, the district court incredibly found that "plaintiff has failed to identify any evidence that Leighton's supervisors instructed him to investigate Rattigan's behavior, draft the EC, or what allegations to include" (J.A.623 n.7). In fact, there is powerful evidence that Gleicher, Pyszczymuka, Smith, and Kaciban were all involved in the process of preparing and referring the false EC, which the district court completely ignored.

28

The evidence shows that shortly after learning about Rattigan's discrimination complaint, Pyszczymuka interrogated Beth Babyak upon her return from a TDY deployment in Riyadh, prodding her for negative information on Rattigan. Pyszczymuka was clearly displeased When Babyak told him that he needed to trust Rattigan. Meanwhile, Gleicher sent Leighton to Riyadh with the approval of Pyszczymuka and Kaciban, even though they knew he had an unresolved drinking problem which had just landed him in rehab after having gone AWOL from his previous assignment. Before he was deployed, Leighton was provided the portion of Gleicher's report, which detailed Rattigan's discrimination complaint. Only OIO management had access to that portion of the report. Leighton's unusual conduct in Riyadh showed that he was "building a case" on Rattigan. Leighton never once mentioned any concerns about Rattigan before he fantastically claimed that while reading a newspaper on vacation weeks after he left Riyadh he realized the importance of the office.

Leighton spoke with Gleicher, and then met with Pyszczymuka for over an hour. Leighton claimed this meeting never took place. Even though Pyszczymuka knew that Gleicher and Kaciban approved of Rattigan's management of the Riyadh office, he claimed he never asked Leighton about the basis for his allegations. Nonetheless, Pyszczymuka directed Leighton to write up his knowingly false allegations and innuendo in an EC. Pyszczymuka prevaricated on this point—first

29

claiming that he did not direct Leighton to draft the EC, then admitting that he "intend[ed] to leave the impression with [Leighton]" to draft the EC, finally testifying that "there was concurrence of feeling" that the EC should be drafted—which demonstrates Pyszczymuka was hiding something (J.A.477A-477B,487-88,489A).

As Leighton was preparing the EC he spoke with Gleicher on occasion about his allegations.  Based on what he had observed in Riyadh, Gleicher did not agree with what was being alleged in the EC, which Gleicher presumably shared with Pyszczymuka.  Pyszczymuka spoke with Kaciban about Leighton's allegations, including that Leighton allegedly believed Rattigan was too close to the Saudis (J.A.395).  Kaciban did not agree, but he instructed Pyszczymuka to tell Leighton to "proceed through the proper channels" with the EC (J.A.394A-395A).

Within a few days of Leighton giving a draft of the EC to Pyszczymuka, Rattigan alerted Pyszczymuka, Gleicher, and Kaciban to many of the same false accusations that Leighton had made which ended up being featured prominently in the EC, the existence of which Rattigan was not yet aware.  Pyszczymuka responded with unequivocal support for Leighton.  He told Rattigan to keep his concerns about Leighton to himself, and presaged what eventually would come to pass when he told Rattigan "Leighton will prepare an appropriate response" (J.A.541).

30

Pyszczymuka then enlisted his top assistant, Walt Smith, to review the draft EC.  Smith gave it back to Pyszczymuka with a note addressed to Pyszczymuka and Kaciban which contained an admission that much of what was in the EC was false.  Smith's note said that "in some cases, [the EC was] inflammatory and unsupported in fact-innuendo, hearsay, etc.," and pointed out that the allegation about Rattigan's supposed unexplained absence from the Riyadh office was contradicted by an email Rattigan had sent to his supervisors.  Smith recommended that Rattigan's response be included in the EC, yet Pyszczymuka never told Leighton to make that revision.  Smith also warned Pyszczymuka and Kaciban that "we have to live with [Gleicher]'s write up-**recent** write up" of the Riyadh office, which contradicted specific allegations as well as the general tenure of the EC. One could hardly imagine a more damning admission that Leighton's EC contained allegations which were false.

Smith's note and comments were given to Leighton, along with a note from Pyszczymuka.  That note is critical to an understanding of the true extent of the knowledge and motivation of OIO management.   In the note Pyszczymuka instructed Leighton to address the EC to the Security Division.  Leighton originally intended to refer the EC to the EAU, although on the eve of trial he tried to change this testimony to suggest he always intended to make a referral to the Security

Division.  Leighton followed Pyszczymuka's order and addressed the EC to the Security Division, and Pyszczymuka referred it to the Division.

In light of this evidence it is inconceivable how the district court could conclude that Rattigan "failed to identify any evidence that Leighton's supervisors instructed him to investigate Rattigan's behavior, draft the EC, or what allegations to include" (J.A.623 n.7).  This is substantial evidence that all four OIO supervisors were acting in concert, and with Leighton, to manufacture and refer allegations they knew to be false.  The district court plainly erred in taking a one-sided view of the evidence that supported the Government.  A reasonable view of the facts—indeed one that Leighton himself admitted was possible—is that Leighton was merely the foil of OIO management.

The district court likewise erred in finding that Kaciban had no involvement in referring the EC and "Gleicher, plaintiff's immediate supervisor, played no meaningful role in the referral" (J.A.619-20).  At trial, after the close of Rattigan's case, the district court itself recognized that in terms of the referral or the preparation of the EC, "[w]e do know that Mr. Kaciban . . . [is] not completely out of the picture, that's for sure" (7/23/2009 AM Trial Tr. at 49).  Among other things, there is evidence that Kaciban approved Leighton's deployment to Riyadh, instructed Pyszczymuka to order Leighton to "proceed through the proper channels" with the EC despite disagreeing with its purported concerns, and was in

the loop while the EC was being reviewed and edited. Gleicher was instrumental in recruiting Leighton to go to Riyadh and discussed the allegations with him as he was drafting the EC. Overlooking this evidence, the district court cited only Kaciban's and Gleicher's own self-serving direct testimony (J.A.619-20). This is a stark example of the district court choosing to view the evidence not in the light most favorable to Rattigan, but construed to fit the Government's case.

Even if Pyszcymuka were the only relevant supervisor, as the district court believed, the evidence of his involvement in and oversight of the preparation of the EC, coupled with the evidence discussed in Point I.B showing that he knew the allegations were false, is overwhelming. The district court erred in finding based on its mischaracterization that "Plaintiff conceded in his deposition and at trial that Pyszcymuka had no first-hand knowledge of the facts in the EC and that Pyszcymuka believed the allegations in the EC to be true" (J.A.611,620,622 n.6). First, this misstates Rattigan's testimony; he never said "Pyszcymuka believed the allegations in the EC to be true." Second, Rattigan's testimony could not establish what Pyszcymuka knew to be true or not. In any event, there is substantial relevant evidence that Pyszczymuka knew the EC's allegations were false, which the district court disregarded. Thus, the district court continued choose to view the evidence in the Government's favor, not in Rattigan's favor.

For similar reasons, the district court misplaced reliance on *Brady v. Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), to conclude that Rattigan's claim failed because Pyszczymuka supposedly "believed" the EC's allegations. Under *Brady*, an employment action is shielded so long as "the employer's stated belief about the underlying facts is reasonable in light of the evidence." *Id.* at 495. But there is ample evidence, discussed above and in Point I.B, that Pyszczymuka's "belief" about the truth of the EC's allegations was unreasonable at best.

Thus, whether Rattigan's supervisors were responsible for the referral of the EC and whether they knew the allegations were false are properly jury questions.

### B. Ample other evidence, completely overlooked by the district court, shows that the alleged "security concerns" in the EC were knowingly false.

Based on this evidence of the intertwined relationship of Leighton and Rattigan's supervisors, the district court seriously erred in discounting the ample evidence demonstrating that Leighton knew each of the significant allegations in the EC was false. Coupled with the highly suspicious circumstances of the preparation and referral of the EC, a jury can find that Pyszczymuka and the other OIO supervisors knew the allegations in the EC were false and referred it anyway.

First and foremost, with regard to the allegations that Leighton was "told" that Rattigan hosted wild parties attended by female "nurses" who were actually

prostitutes, this Court previously explained that there is evidence these allegations were knowingly false:

> Rattigan contends that it was widely known by his co-workers, including OIO staff, that he was dating — and later married — a woman who was in fact a nurse. . . .  Moreover, although Leighton's EC states that he "was told" that Rattigan had hosted a party "in which he and two other [FBI employees] had had sexual relations with one or more of the so-called 'nurses,'" the Security Division investigation concluded that "[n]one of the personnel interviewed could offer any information which would support [Leighton's] allegation that Legat Rattigan, along with several other [temporary duty] personnel, engaged in sexual relations with these women."  All this suggests that Rattigan may be able to prove that (1) no one "told" Leighton that Rattigan hosted parties in which he and others engaged in sexual relations with "nurses," and that (2) because Leighton and other OIO officials knew that Rattigan's girlfriend and her co-workers were in fact nurses, the claim that circumstances suggested they might instead be prostitutes was knowingly false.

*Rattigan II*, 689 F.3d at 772-73 (citations omitted) (citing J.A.570); (*see also* J.A.156-159) (Rattigan's wife's testimony that when she met Rattigan she was working as a nurse in Riyadh).  Thus, this Court has already concluded that there is adequate evidence to find that the allegations regarding parties and prostitutes were knowingly false; the district court simply ignored this Court's conclusion.

It is also significant that the EC identified Joseph Manarang as one source of information (J.A.160-162), yet the Security Division report noted that "Manarang stated that he ha[d] no knowledge about any sexual relationships that may or may not have occurred between these 'nurses' and Legat Rattigan or other TDY

35

personnel" (J.A212).   There is also the investigator's report which noted that "[i]nformation obtained during interviews conducted of [several TDY staff and Unit Chief Judson Ray] failed to support Leighton's assertions that the women described as 'nurses' were prostitutes" (J.A.193)

Attempting to whitewash this knowing falsity, the Government submitted two documents in the district court that had not been part of the trial in this case.[7]

---

[7] The unfairness is palpable in the district court's accepting new evidence from the Government regarding knowing falsity, while denying Rattigan additional discovery on the same issue, even after this Court directed that this should take place.

███████████████████████    ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████    ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████    Therefore, these documents fail to undercut the knowing falsity of the allegations regarding wild parties and prostitutes.

Turning to the allegation that "[a]t several times during [Leighton's] deployment, several TDY personnel commented about the apparent lack of involvement of Legat Rattigan and ALAT Gamal Abdel-Hafiz in the PENTTBOMB investigation" (J.A.137), the evidence shows quite the contrary—that Rattigan was "extremely involved" in the PENTTBOM investigation (J.A.365,387A,390). Indeed, Gleicher admitted that he "was satisfied that they were addressing the Pentbomb investigation and doing what they were supposed to be doing" (J.A.444). During his trip to Riyadh, Gleicher had learned that "everyone in the Riyadh office was supportive of the Pentbomb investigation and it was the number one priority in Riyadh" (J.A.443). As this Court previously explained, the final Security Division report "indicated that Leighton's assertions regarding Rattigan's supposed inactivity in the FBI's September 11 investigation 'lack[ed] corroboration and [were] unfounded.'" *Rattigan I*, 643 F.3d at 980.

37

The EC also contains several distinct knowingly false allegations with regard to the closing of the Riyadh office during the Hajj holidays and Rattigan's pilgrimage to Mecca with Abdel-Hafiz and their Saudi counterparts in the Mabahith (J.A.441-442). After traveling around the Middle East with FBI Director Mueller at the Director's request, and attending the week-long annual LEGAT conference, Rattigan returned to Saudi Arabia to perform the Hajj, a pilgrimage to Mecca (J.A.360,384-85). Gleicher specifically granted Rattigan and Abdel-Hafiz permission to perform the Hajj with their counterparts in the Mabahith (J.A.379-80). Rattigan informed Gleicher, who sent an email to Leighton and Pyszczymuka on February 21, 2002, explaining that "Rattigan just called and advised that he and ALAT Abdel-Hafiz are performing Hajj in Mecca" and "[o]ne of the TDYers, Paul Culligan, was placed in charge of the office" (J.A.553-34). The email further stated that "Wil and Gamal may be reached through the following officers with the Mabahith: [redacted names and phone numbers]" (J.A.553-34). Abdel-Hafiz likewise informed OIO management by email and verbally to Gleicher of his whereabouts and how he could be reached while on Hajj (J.A.379,381,386-87).

The EC, however, provides an entirely fabricated version of what occurred. The EC claims that Leighton unsuccessfully attempted to contact Rattigan on his home and cell phone numbers, suggesting that OIO management knew nothing of Rattigan's plans to be out of the office, and "then caused the Executive Locator to

38

be checked for a contact number for Legat Rattigan with negative results," suggesting that OIO management had no phone number to reach Rattigan (J.A.141). The EC then claims that Leighton spoke with Leroy Dempsey "who commented that 'the inmates were running the asylum,'" and that Culligan told Leighton he had not been given any instructions in case of an emergency and that "he had no means of contacting Legat Rattigan or ALAT Abdel-Hafiz" (J.A.141). The EC also claims that Culligan called back and said "that it might take as long as six hours for the Mabahith to locate" Rattigan and Abdel-Hafiz (J.A.141). This entire account is discredited by Rattigan's affidavit (J.A.334-36), and the Security Division's interviews of Dempsey and Culligan (J.A.192,219-20,255-56).

Next, the accusation that Rattigan mishandled a high-priority lead is contradicted entirely by Rattigan and Abdel-Hafiz's testimony (J.A.283,336-37). After the Hajj, Rattigan developed a viral infection and was on sick leave on March 8, 2002 when he received a phone call from Leighton about a communication that Leighton construed as a lead that required a response from the Riyadh office (J.A.87,536). Leighton insisted that the communication was urgent and that the Riyadh office needed to provide a response that very day—already a weekend evening in Saudi Arabia; in fact, Dan Coleman, the case agent, did not expect it to be treated as an expedited lead (J.A.336-37,373-78).

Prior to Pyszczymuka making his referral to the Security Division, Rattigan brought to the attention of OIO management that Leighton had completely fabricated the urgency of this supposed lead. On March 11, 2002, Rattigan emailed Gleicher, Pyszczymuka, and Kaciban to complain about Leighton's conduct during that phone call and in a subsequent conversation with Abdel-Hafiz, and to alert OIO management to false allegations Leighton had been making about Rattigan (J.A.361,536-37). At the time, Rattigan was unaware that Leighton had prepared an EC criticizing him (J.A.363).

The EC also accused Rattigan of being absent from the Riyadh office for seven weeks and gave the false and misleading impression that the absence was largely unaccounted for (J.A.143,145). This is notable because Smith's note that he gave to Pyszczymuka and Kaciban after reviewing Leighton's draft of the EC specifically identified the mention of Rattigan's absence from the office as a problem (J.A.548-49) ("this [the EC] should be paired with Rattigan's response-especially his absence from Legat office for xxx weeks-he seems to justify that in his e-mail"). Thus, Leighton, Pyszczymuka, Smith, Kaciban, and Gleicher all *knew* that it was false and misleading for the EC to imply that Rattigan's absence from the Riyadh office was unaccounted for or of any moment.

Regarding the accusation that Rattigan wore Saudi attire on occasion, *Rattigan II* held that this statement was true and therefore was not one of the

40

accusations Rattigan could proceed with on remand. 689 F.3d at 772 ("Rattigan has acknowledged, for instance, that he occasionally wore traditional Saudi clothing to the Embassy").  However, the EC also falsely claimed that "[t]he impression created in the minds of the majority of the TDY employees [of Rattigan wearing Saudi attire], as expressed to SSA Leighton, was that Legat Rattigan had 'gone native'" (J.A.137).  That was the most important thrust of the allegation, not the neutral fact that Rattigan was wearing Saudi garb.  Yet, the Security Division investigation completely disproved this allegation.  None of the numerous TDY personnel interviewed expressed any concern that Rattigan had "gone native" (J.A.196-287); and the AIU report concluded that "[a] review of the information provided by the TDY personnel assigned to [Riyadh] has concluded that there is no security risk present relative to the issues of allegiance, foreign influence, or personal conduct on the part of LEGAT RATTIGAN" (J.A.571).

Moreover, while it was true that Rattigan wore Saudi attire on certain occasions, the EC included more specific factual allegations that are demonstrably false.  The EC misleadingly implies that the concern was not just that Rattigan wore such attire, but that he wore it "while conducting official business" (J.A.137). In his affidavit submitted in opposition to the Government's motion (which the district court never once mentioned) Rattigan explained that "Leighton saw me wear 'Saudi Arabian national attire' to the embassy, but only after business hours,

41

when I was summoned by FBIHQ to pick up documents from the embassy to be expeditiously disseminated to the Mabahith" (J.A.327-28). The Security Division confirmed this point (J.A.193) ("The personnel that observed Legat Rattigan in the Saudi attire indicated that Legat Rattigan did not wear this attire during the day time but rather wore the Saudi attire during the evenings, typically when he was meeting with the Mabahith.").

Turning to the absurd assertion that Rattigan's Mabahith colleagues "were even attempting to identify a 'suitable wife' for [him]," this statement was misleading and pure hyperbole. The evidence shows that "Leighton, as a former LEGAT, was aware of the common practice for liaison to ask Legat personnel if they were married and discuss marrying a local; and several LEGATs have attested to this" (J.A.328). Moreover, other than Leighton's twisted opinion that Rattigan's Mabahith colleagues were attempting to find a wife for Rattigan, there is no credible evidence that the Saudis were responsible for finding Rattigan a wife (J.A.364).

Finally, the EC alleged that Rattigan and Abdel-Hafiz refused to allow TDY staff to interact directly with the Saudi security service (J.A.144) ("ALAT Abdel-Hafiz insisted that the TDY SAs could not be used for liaison contacts with the Mabahith at the Mabahith's request."). This is misleading and false. First, the Security Division investigation revealed that Rattigan had "allowed particular TDY

42

personnel to accompany him to meetings with the Mabahith" (J.A.191,337) ("Leighton was also aware that several TDYers met with Mabahith representatives, including but not limited to [listing names]."). Second, Rattigan had "explained to Leighton that the Saudis specifically stated that they preferred to limit their FBI contacts to the LEGAT and ALAT because of our permanent positions in Riyadh and also for accountability" (J.A.337). Rattigan had explained this to Pyszczymuka before the EC was referred to the Security Division.

Rattigan's affidavit documents numerous other accusations in the EC that were knowingly false, and identified several conversations that Leighton claimed he had with Rattigan that were pure fiction (J.A.326-38). Rattigan asked the district court to consider all of this evidence but the district court refused out-of-hand to consider any of it (J.A.623 n.9).

### C.     There is sufficient evidence for a jury to find that the false EC would not have been referred absent a motive to retaliate.

Taken together, the testimony and evidence provides compelling grounds for a jury to find that Leighton and OIO management knew that numerous allegations in the EC were false when they referred the EC to the Security Division, and that they referred the EC based on a motive to retaliate. Therefore, it was improper for the district court to grant summary judgment.

The district court mistakenly concluded that Rattigan's claim must be thrown out because of the Supreme Court's recent decision in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013). *Nassar* held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened ['motivating factor'] causation test." *Id.* at 2533. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* The district court reasoned that because there were facts included in the EC that were apparently true, the EC would have been referred absent the many falsehoods it contained, and therefore, Rattigan could not prove but-for causation.

This deeply flawed reasoning rests on the district court's assuming the ultimate factual issue in this case, *i.e.*, that the adverse employment action would have occurred even absent retaliation. *Nassar* did not hold, as the district court has construed it here, that a retaliation claim must fail as a matter of law whenever an employer weaves a non-retaliatory excuse into the adverse employment action. Instead, as in any discrimination case where there is a genuine issue about the reason for the adverse action, the jury may discredit the defendant's purported explanation and find instead that the employer was motivated by animus. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) ("[T]he plaintiff may attempt to establish that he was the victim of intentional

discrimination 'by showing that the employer's proffered explanation is unworthy of credence,'" because "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).  This point is reinforced by the fact that the Supreme Court's judgment in *Nassar* was not that the plaintiff's retaliation claim had to be dismissed because his employer offered a non-retaliatory explanation for his termination.  *Id.* at 2532.  Instead, the Court vacated the jury's verdict, which was based on a motivating-factor standard, and remanded to apply a but-for causation standard.  *Id.* at 2534.

The Second Circuit has explained the proper application of the standard announced in *Nassar*.  In *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013), the court recognized that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846 (citing *Nassar*, 133 S. Ct. at 2526, 2533); *see also Ponce v. Billington*, 679 F.3d 840, 845-46 (D.C. Cir. 2012) ("we agree . . . that 'sole' and but-for cause are very different").[8]  This is because "a plaintiff's injury can have multiple 'but-

---

[8] Courts in several other circuits have likewise recognized that the but-for standard adopted in *Nassar* does not require the plaintiff to show that retaliation

45

for' causes, each one of which may be sufficient to support liability.  Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." *Id.* at 846 n.5 (citations omitted).  The Second Circuit's conclusion is particularly apt here: "The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Id.*

The *Zann* court also explained that "the but-for standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." *Id.* at 845.  Instead, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action." *Id.* at 846.

---

was the "sole cause" of the adverse action.  *E.g.*, *Cason v. S.C. State Ports Auth.*, No. 2:11-cv-2241-RMG, 2014 U.S. Dist. LEXIS 18708, at *10-14 (D.S.C. Feb. 14, 2014); *Shumate v. Selma City Bd. of Educ.*, No.11-00078-CG-M, 2013 U.S. Dist. LEXIS 153286, at *6-7 (S.D. Ala. Oct. 24, 2013) (noting that the "'but for' standard adopted by the Court in *Nassar* is not the 'sole cause' standard" is an "axiomatic premise"); *Little v. Tech. Specialty Prods. LLC*, No.4:11-CV-717, 2013 U.S. Dist. LEXIS 152042, at *18 (E.D. Tex. Oct. 23, 2013).

Here, Rattigan has put forth ample evidence from which the jury could conclude that the EC would not have been referred absent a retaliatory motive. While the Government may argue that the EC contained factually true statements and that it would have been referred based on those statements alone, the jury could just as easily find that the EC would not have been written and referred absent a retaliatory motive—as the circumstances of the referral strongly suggest. Indeed, *this is exactly what the previous jury already found* (7/28/09 Trial Tr. at 72-73) (instructing on causation: "A causal connection exists if defendant would not have initiated the investigation if plaintiff had not engaged in protected activity; in other words, defendant would not have initiated the investigation 'but for' plaintiff's protected activity.").

Given that the jury in this case actually applied the correct standard, it is inexplicable how the district court could now conclude that on this record a jury could not conclude that the referral was based on a motive to retaliate. The district court short-circuited the jury process by making a critical finding of fact—indeed the central factual dispute in this case—*i.e.*, that the EC would have been referred regardless of retaliatory motive. However, based on the evidence, a reasonable jury could find—in fact, *did find*—that the EC would not have been referred but-for a retaliatory motive. *Nassar* simply sets forth the proper causation standard on which the jury must be instructed when this case proceeds to trial; it does not allow

47

employers to retaliate with impunity by offering a non-retaliatory reason post hoc for the adverse employment action.

The Seventh Circuit's analysis of an exceptionally similar claim in *Hobgood v. Illinois Gaming Board*, 731 F.3d 635 (7th Cir. 2013), provides a spot-on explanation for why summary judgment was improper here. In *Hobgood*, the plaintiff sued for unlawful retaliation when his state agency employer subjected him to intensive investigations and ultimately fired him, although another agency had vindicated him after its own investigation, because of his protected conduct in assisting another employee in his lawsuit against the same employer. *Id.* at 637. The court explained that the plaintiff relied on the "direct method" to establish unlawful retaliation, as opposed to the indirect method. *Id.* at 642. The direct method demands evidence that the plaintiff engaged in protected activity, was subjected to an adverse employment action, and there was a causal link between the two. *Id.* This is the same method of proof that at issue here.

The Seventh Circuit explained that to establish causation, the direct method allows either direct evidence of causation or "a 'convincing mosaic' of circumstantial evidence, by relying on evidence of suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Id.* at 643 (alterations in original; quotation marks and citations omitted).

48

> The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity. To answer that question, the individual "bits and pieces" presented by the plaintiff must be put into context and considered as a whole. All reasonable inferences, of course, must be drawn in favor of the non-moving party. Only then can it be seen whether the plaintiff's evidence amounts to a "convincing mosaic" sufficient to withstand a motion for summary judgment or judgment as a matter of law.

*Id.* at 644. The court went on to apply the appropriate careful analysis to the context of the plaintiff's investigation and termination to show that the bits and pieces established the necessary convincing mosaic, and thus summary judgment was improper. *Id.* at 644-48. A review of that analysis reveals significant parallels with the evidence in this case and for all of the reasons the court found summary judgment unwarranted there, it is improper here. *See also Cason*, 2014 U.S. Dist. LEXIS 18708, at *13-14 (applying the same analysis and denying summary judgment).

> **D.    The district court erred in deciding that the jury could not determine the real motive for the security referral or Rattigan's damages without second-guessing the Security Division.**

Overlooking the fairly obvious solution offered in *Rattigan I* to avoid an *Egan* problem, the district court wrongly decided that the jury would invariably be left to second-guess the Security Division decision's to investigate. First, the court said, "if a jury were to evaluate whether the reason the EC was referred was retaliation, that assessment would necessarily allow the jury to second-guess the

49

Security Division's conclusion . . . that the issue of foreign influence warranted further investigation" (J.A.625).  Second, it said, "a reasonable jury should not be permitted to parse the EC. . . . [W]here facts present enough information to justify a security investigation, a jury may not be permitted to find that the real motive for some statements was not, as the Security Division concluded, legitimate security concerns" (J.A.626).  Third, the court said, "it is not possible based on the record in this case for a jury to find that plaintiff's alleged damages resulted from the referral of the EC, as opposed to the investigation itself" (J.A.626).

These conclusions are all wrong because they turn the issue on its head. There is no *Egan* problem with the jury finding that the referral was purely retaliatory, even if the Security Division, as a matter of protocol, was required to conduct an investigation based on the allegations contained in the EC.  This is because, as this Court has already determined in *Rattigan I* and *II*, there is no *Egan* concern in the jury questioning the decision of non-security-decision makers like OIO supervisors.  *Rattigan II*, 689 F.3d at 766.  The jury is not being asked to second-guess the Security Division, as the district court mistakenly believed, by questioning the motives for the OIO referral.

The district court reached the conclusion that the jury would necessarily have to second-guess the Security Division to find in Rattigan's favor by contorting the facts and misstating Rattigan's position.  The court stated: "While it

50

may not be necessary that every allegation in the EC is false to withstand summary judgment under *Rattigan II*, where facts present enough information to justify a security investigation, a jury may not be permitted to find that the real motive for some statements was not, as the Security Division concluded, legitimate security concerns" (J.A.626).  This is a gross misstatement of the facts.  The Security Division never concluded that legitimate security concerns were the *real motive* for *any* of the statements in the EC.  Instead, the Division instigated an investigation because of the *professed* security concerns in the EC, which the investigation revealed were entirely "unfounded" (J.A.195,571).

Likewise, the court claimed that "[Rattigan] concede[d] that the referral included true statements that raised legitimate security concerns" (J.A.628) (citing page 24 of Rattigan's summary judgment brief).  Nowhere on page 24, nor anywhere else in his opposition brief below did Rattigan concede such a crucial point.  It has been Rattigan's position since the beginning of this litigation that the professed security concerns in the EC were illegitimate and, as the Security Division determined, "unfounded."

With regard to damages, the district court was mistaken that the jury would be required to distinguish damages that flowed only from the referral as opposed to the Security Division's investigation and it would be left questioning the Division's investigation.  What *Rattigan I* and *II* instructed was that the jury could

51

not question the Security Division's decisions.  It never said that Rattigan could not recover damages from a retaliatory referral that caused the Security Division investigation.  Since that is the natural and probable consequence of the referral—indeed, that is exactly what Pszyzcmuka requested in his cover memo referring the EC to the Security Division (J.A.564-66)—the damages that flow from that investigation are part of Rattigan's compensable injuries.  Calculating those injuries does not require the jury to find that the Division had ulterior motives in commencing the investigation.  Indeed, it does not require the jury to question the Security Division at all.[9]

The district court decided that "at trial, Rattigan attributed his damages to the initiation of the investigation and not to the OIO referral" based an isolated statement in Rattigan's counsel's closing statement: "counsel argued that 'this investigation was sufficient to qualify as an adverse employment decision. It was threatening to his career'" (J.A.627).  Counsel's argument that the investigation

---

[9] This is no different than any standard causation case.  For example, say driver A causes an accident that injures driver B who is taken to a hospital where medical care is administered and B is left permanently paralyzed.  In a suit brought by B against A, B is not required to establish that the medical care he received was inadequate in order to recover from A the full extent of his damages.  While driver A may want to bring a cross-claim for malpractice against the hospital, that does not affect B's claim against A.  Likewise, Rattigan need not ask the jury to make any determination about the Security Division's decision to investigate; he need only show that the referral to the Division was retaliatory, and that the consequence of the referral was injury to his reputation and career.

qualified as an adverse employment action was simply in response to the district court's erroneous conclusion that "the OIO referral alone was not actionable" and its concomitant error in charging the jury that Rattigan had to prove that the initiation of the security investigation was a materially adverse employment action. *Rattigan I*, 643 F.3d at 985.  This Court reversed the district court on this point because it found that "[t]he referral alone created the very real possibility not only that Rattigan would face a stressful and potentially reputation-damaging investigation, but also that the FBI would revoke his security clearance and terminate his employment."  *Id.* at 986.  Thus, there is nothing to the district court's reliance on this isolated statement in counsel's closing argument.

In *Rattigan I*, the Court offered a simple solution to avoid any *Egan* problem going forward: "[T]he district court could, for example, instruct the jury to assume that the reasons the Division gave for commencing an investigation—provided those reasons did not rest on false or misleading allegations—fully justified undertaking the investigation."  *Id.* at 989.  The district court overlooked this expedient.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING RATTIGAN THE OPPORTUNITY TO CONDUCT NECESSARY DISCOVERY ABOUT THE KNOWING FALSITIES IN THE SECURITY REPORT, AS THIS COURT HAD INSTRUCTED

The district court abused its discretion by denying Rattigan the opportunity to conduct the discovery this Court instructed before deciding the motion for summary judgment.  From its initial status conference following remand, the district court showed hostility toward Rattigan's request for any discovery on the knowing falsity of the allegations in the EC (J.A.51-59).  Indeed, the court went so far as to express its pre-judgment that it did not believe there was anything false in the EC other than the allegation that Rattigan had hosted wild parties (J.A.58).

Rattigan meticulously complied with Rule 56(d) by "show[ing] by . . . declaration that, for specified reasons, [he] cannot present facts essential to justify [his] opposition."  Fed. R. Civ. P. 56(d).  His attorney's declaration laid out four targeted areas of necessary discovery.  First, it explained that "plaintiff should be permitted additional discovery about the interactions that took place between and amongst" Pszyzcmuka, Smith, Gleicher, Kaciban and Leighton because "[t]he process that led to the creation of the . . . EC was never the focus of discovery that was completed before the first trial" (J.A.343).[10]

---

[10] Rattigan has never had the opportunity to depose Walter Smith, a critical figure in the drafting and referral of the EC.  This makes the district court denial this request on remand all the more prejudicial to Rattigan.

Second, Rattigan explained that he needed additional discovery about Leighton because the Government's "summary judgment motion relies principally on purported allegations of fact set forth by Leighton" (J.A.340). Rattigan further explained that "many of the purported allegations of fact by Leighton, including his accounts of alleged conversations he had with the [Rattigan], which are denied by [him], are not corroborated by any contemporaneous documents or other witnesses" (J.A.340) (citations omitted). "[G]iven that many of the factual disputes in this case come down to whether you believe Leighton or [Rattigan], [Rattigan] should be permitted discovery that will permit a jury to evaluate the credibility of Leighton" (J.A.341).

Third, Rattigan sought "discovery regarding the specific false accusations in Leighton's EC, which are now the determinative issue under *Rattigan II*" (J.A.341). The discovery he sought in this respect included "deposing Joseph Manarang, who Leighton identified as one source of information for his report"; "[d]eposing Leroy Dempsey and Paul Culligan, who . . . Leighton identified in his EC as the people he spoke with while supposedly trying to locate Rattigan when he was attending the Hajj in February 2002"; and "[d]eposing Dan Coleman and Gary Rohen," who were central to the allegation in the EC that Rattigan and Gamal Abdel-Hafiz mishandled "a lead purportedly sent from the Strategic Information Operations Center (SIOC) on or about March 8, 2002" (J.A341-43).

Finally, Rattigan sought discovery "on two documents [the Government submitted] in support of [its] motion for summary judgment that report alleged incidents and conduct of the plaintiff which were not part of the case prior to the appeals in this case" (J.A.343) (referencing Exhibits I and M to the Government's motion). Rattigan explained that "[t]he subject matter of these exhibits was never part of this case before the appeal, and no testimony was offered at the trial of this matter" and "[s]ince the [Government] now apparently seeks to rely on this incident, [Rattigan] should be permitted discovery about the matters referred to in these exhibits, including discovery of those individuals, *e.g.*, Ray and Kaciban, who were allegedly involved in the incident" (J.A.343).

In a single paragraph at the end of its decision, the district court rebuffed these detailed showings with hardly any analysis. Perhaps the most stark error in the district court's opinion is its denial of additional discovery regarding Leighton and his relationship with the OIO management. The court concluded that this discovery was unnecessary because Leighton was not Rattigan's supervisor (J.A.631). This point is wrong for the same reason that the district court erred in overlooking the evidence of collusion between Leighton and Rattigan's supervisors in preparing and referring the EC. *See supra* Point I.A.

But even more disturbing is that the district court acknowledged that Rattigan made a "compelling argument that Leighton acted at the behest of OIO

56

supervisors" based on "[Leighton's] testimony that OIO management may have used him, as an African-American, to retaliate against Rattigan" (J.A.623 n.7). Yet, in a twist of irony, the district court found that Rattigan "provided no facts to support Leighton's suspicion" and "failed to identify any evidence that Leighton's supervisors instructed him to investigate Rattigan's behavior, draft the EC, or what allegations to include" (J.A.623 & n.7). This is precisely the evidence that Rattigan sought, which the district court denied.

The district court also concluded that Rattigan "had the opportunity and incentive to explore what Pyszcymuka knew or did not know during prior discovery and at trial" and therefore "[n]o further discovery [was] . . . necessary on this point" (J.A.631). This flatly ignores the Court's contrary conclusion in *Rattigan II*, 689 F.3d at 773 ("Because we set forth this knowingly false standard for the first time on appeal, Rattigan had little reason to thoroughly develop evidence of knowing falsity in the district court."). Finally, the court overlooked the discovery that Rattigan explained he needed regarding the sealed exhibits that the Government relied on heavily in moving for summary judgment.

Because Rattigan made the necessary showing under Rule 54(d) for further discovery, as per this Court's instruction in *Rattigan II*, the district court abused its discretion in refusing to permit Rattigan to conduct discovery that the district court

itself recognized was dispositive of Rattigan's "most compelling argument" (J.A.623 n.7).

## III. THE "KNOWINGLY FALSE" STANDARD IS UNWORKABLE, UNNECESSARILY LIMITS IMPORTANT TITLE VII PROTECTIONS, AND PRODUCES PARADOXICAL RESULTS; THE PRESIDENT'S EXECUTIVE ORDER FOR SECURITY REPORTING PROVIDES A BETTER STANDARD

The district court's decision in this case demonstrates that the "knowingly false" standard is unworkable and eviscerates Title VII protection for some victims of illegal discrimination or retaliation.[11]  It also produces paradoxical results as seen in other district court decisions that have grappled with it.  A better standard, one that more appropriately balances the sensitive national security concerns animating the panel's decision in *Rattigan II*, is the standard adopted by the President for security reporting in Executive Order 12,968.

The knowingly-false standard is fundamentally flawed because it takes the facts included in a security referral out their context of reporting apparent security

---

[11] In its petition for en banc review following *Rattigan II*, the Government argued that the knowingly-false standard was unworkable.  One of its principal reasons was that it was unclear how the standard should be applied where only some of the reported allegations were knowingly false.  While he opposed the Government's petition, Rattigan noted that he "respectfully disagree[d] with the knowingly-false standard." Appellee's Response to Appellant's Petition for Rehearing En Banc at 13, *Rattigan II* (D.C. Cir. No. 10-5014). Rattigan was confident the district court would correctly apply the standard to his claim and grant a re-trial, as the *Rattigan II* panel strongly suggested was the proper course.

concerns. Analyzing the facts for their abstract truth, but disregarding the implication that these facts gave rise to security concerns is unworkable. This case highlights that point. That Rattigan wore Saudi attire on occasion is a true statement, but the additional statement that it gave the appearance he had "gone native" and the implication that it raised a security concern are false. There is no workable analysis to consider "facts" in a security report, without considering their context. The President's own directive on security referrals recognizes this. Executive Order No. 12,968 does not call for the reporting of any truthful information, but instead, only "information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security."

As applied by the district court here, the knowingly-false standard effectively renders Title VII reporting claims null except in the bizarre case that a referring supervisor admitted that she or he knew all of the allegations in the report were false. This will almost certainly never occur, and thus, one can see that applying the standard leads to what *Rattigan II* sought to avoid. 689 F.3d at 711. But this is effectively what the district court achieved in applying the standard to dismiss Rattigan's case.

---

However, the district court's serious misapplication of the knowingly-false standard now convinces Rattigan that the standard is fatally flawed.

59

It also creates an unfair recipe for an employer to avoid liability for obvious retaliation.  For instance, a supervisor in the FBI who admittedly desires to unlawfully retaliate against a subordinate could simply order another subordinate to draft a security report with any allegations he or she wants, so long as the reporter does not tell the supervisor if the allegations are true or not.  The supervisor could then refer the report to the Security Division and would be immune from liability.  Neither fairness nor logic permits denying a Title VII claim based on those facts.

The knowingly-false standard goes further than necessary and bars valid Title VII claims without an expedient purpose.  As this Court previously recognized in *Rattigan II*, "it is [this Court's] duty not only to follow *Egan*, but also to 'preserv[e] to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation."  689 F.3d at 770 (quoting *Rattigan I*, 643 F.3d at 984).  *Rattigan II* adopted the standard in response to the Government's contention that "imposing a standard for Title VII liability that conflicts with the reporting standard set forth in Executive Order 12,968 . . . creates a risk that an employee's compliance with the Order could provide a basis for Title VII liability," which may dissuade some valid reports.  *Id.* at 768.  That Executive Order does not call for reports of any true information, but only demands reports of "information that raises doubts" about security clearance.

Moreover, the standard produces paradoxical results; just look at *Burns-Ramirez v. Napolitano*, 962 F. Supp. 2d 253 (D.D.C. 2013). There, Judge Collyer concluded that the plaintiff's Title VII claim could proceed under *Rattigan II* even though the plaintiff's claim rested on a discriminatory security referral that led to the plaintiff's Security Clearance being *revoked*. It would be an unjust paradox for Rattigan—whose Security Clearance was *upheld* after an investigation determined that the allegations were "unfounded"—to be without a remedy after more than 10 years of litigation when one jury already found the referral was retaliatory and caused Rattigan significant damages.

One solution is to adopt the standard from the Executive Order itself as the appropriate standard for a Title VII claim, which would obviate any concern of a conflict between the two. Instead, the panel fashioned a standard that swept too broadly and narrowed Title VII protections more than necessary. The rationale for adopting the knowingly-false standard was to avoid discouraging reports that would otherwise be required under the Executive Order. But adopting for Title VII claims the Executive Order standard will not dissuade any additional reporting. Indeed, the Government already subjects employees to "internal discipline for false *or inaccurate* reporting." *Rattigan II*, 689 F.3d at 770 (emphasis added) (citing the Government's brief). The panel properly rejected the Government's argument that "Title VII litigation presents a greater risk of chill because of its public nature, the

61

lengthy timeframe of civil cases, and other burdens imposed by litigation." *Id.* As explained in *Rattigan II*, "internal agency proceedings carry a more immediate threat of discipline [than a Title VII action], up to and including removal." *Id.* at 771 (quotation marks omitted). To reconcile the needs of appropriate reporting for national security purposes, and Title VII protections, the Court should adopt the Executive Order 12,298 standard for reporting-based Title VII claims.

Under that standard, Rattigan's retaliation claim must go to a jury. Not a shred of the EC's allegations (true or otherwise) raised doubts that Rattigan's continued eligibility for access to classified information was anything less than clearly consistent with national security. Thus, according to the Executive Order standard, the EC was not necessary to make any security clearance decision, and predicating Title VII liability on the referral of the EC will in no way interfere with the President's ability to make a national security decision.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order

granting summary judgment and remand for further discovery and trial.

Dated: July 9, 2014

Respectfully submitted,


/s/ Jonathan C. Moore
Jonathan C. Moore (JM 6902)
Joshua S. Moskovitz (Bar No. 55224)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400
Fax: (212) 557-0565
jmoore@blhny.com
jmoskovitz@blhny.com

James R. Klimaski (Bar No. 243543)
KLIMASKI & ASSOCIATES, P.C.
1625 Massachusetts Avenue NW, Suite 500
Washington, DC  20036-2245
(202) 296-5600
Fax: (202) 296-5601
Klimaski@Klimaskilaw.com

*Counsel for Appellant Wilfred S. Rattigan*

## CERTIFICATE OF COMPLIANCE

I certify that this brief was prepared with Microsoft Office Word 2007 contains less than 14,000 words, specifically 13,989 words, and is proportionally spaced in Times New Roman font with 14-point typeface.  This file will be converted electronically to the Adobe PDF format for electronic filing.

Dated: July 9, 2014

/s/ Joshua S. Moskovitz
Joshua S. Moskovitz (Bar No. 55224)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400

64

**CERTIFICATE OF SERVICE**

I certify that the foregoing brief will be served electronically to the following counsel for the Appellee in this case automatically on July 9, 2014, subsequent to properly filing the item in the approved electronic PDF format with this Court's CM/ECF system.  A copy of the sealed version of the brief without redactions will also be served by email, as will the required paper copies.

> Charles W. Scarborough
> Marleigh D. Dover
> Appellate Staff Attorneys
> Civil Division – Room 7244
> U.S. Department of Justice
> 950 Pennsylvania Avenue NW
> Washington, DC  20530-0001


> /s/ Joshua S. Moskovitz
> Joshua S. Moskovitz (Bar No. 55224)
> BELDOCK LEVINE & HOFFMAN LLP
> 99 Park Avenue, Suite 1600
> New York, New York 10016
> (212) 490-0400