**PUBLIC COPY – SEALED MATERIAL DELETED**

**[ORAL ARGUMENT NOT YET SCHEDULED]**

No. 13-5374

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

WILFRED SAMUEL RATTIGAN,

Plaintiff-Appellant,

v.

ERIC H. HOLDER, ATTORNEY GENERAL,

Defendant-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

**PUBLIC BRIEF FOR THE APPELLEE**

_____

STUART F. DELERY
 *Assistant Attorney General*
RONALD MACHEN
 *United States Attorney*

MARLEIGH D. DOVER
 *(*202) 514-3511
CHARLES W.SCARBOROUGH
 (202) 514-1927
 *Attorneys, Appellate Staff*
 *Civil Division*
 *United States Department of Justice*
 *950 Pennsylvania Ave., N.W., Rm. 7244*
 *Washington, D.C. 20530-0001*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned certifies as follows:

**A.      Parties and Amici**.

Plaintiff-appellant is Wilfred S. Rattigan.  Defendant-appellee is Attorney

General Eric H. Holder.  There are currently no *amici* in this case.

**B.      Rulings Under Review.**

Plaintiff seeks review of an October 31, 2013 memorandum opinion and order

issued by the Hon. Ellen Segal Huvelle in Civ. No. 04-2009 (D.D.C.), granting the

government's motion for summary judgment.

**Related Cases.**

This case was the subject of a prior appeal to this Court (No. 10-5014).  The

panel in the prior appeal (Rogers, Tatel, Kavanaugh, JJ) issued two published

opinions, reported at 643 F.3d 975, and 689 F.3d 764.  Counsel is not aware of any

related case currently pending in this Court or any other court.

s/Charles W. Scarborough
_____
Charles W. Scarborough
Attorney for Appellee

# GLOSSARY

EC              Electronic Communication

FBI             Federal Bureau of Investigation

LEGAT           Legal Attaché

OIO             Office of International Operations

SA              Special Agent

TDY             Temporary Duty Assignment

UC              Unit Chief

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES

GLOSSARY

STATEMENT OF JURISDICTION ............................................................... 1

INTRODUCTION AND STATEMENT OF THE ISSUES ....................................... 1

RELEVANT STATUES AND REGULATIONS .......................................... 4

STATEMENT OF THE CASE ...................................................................... 4

    A.    Relevant Facts ................................................................ 4

    B.    Prior Proceedings ......................................................... 8

        1.    *Rattigan I*. ................................................... 9

        2.    *Rattigan II* ................................................. 10

    C.    District Court's Decision on Remand ....................................... 14

SUMMARY OF ARGUMENT .................................................................. 21

STANDARD OF REVIEW ...................................................................... 26

ARGUMENT ...................................................................................... 26

    I.    THE DISTRICT COURT CORRECTLY HELD THAT
        RATTIGAN FAILED TO SHOW THAT RELEVANT FBI
        OFFICIALS REPORTED ANY INFORMATIN ABOUT HIM
        THAT THEY KNEW TO BE FALSE ...................................... 28

        A.    The District Court Properly Held That None Of Rattigan's
            Supervisors Knowingly Reported False Information To The
            Security Division ........................................................ 29

      B.      Leighton Did Not Knowingly Report False Information .......... 37

II.      THE DISTRICT COURT CORRECTLAY HELD THAT A REASONABLE JURY COULD NOT PROPERLY FIND THAT RETALIATORY ANIMUS WAS THE BUT-FOR CAUSE OF PLAINTIFF'S REFERRAL TO THE SECURITY DIVISION .......... 43

III.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING RATTIGAN'S REQUESTS FOR BROAD NEW DISCOVERY ............................................................................................. 49

CONCLUSION ................................................................................................. 52

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                           **Page**

*Aviles v. Cornell Forge Co.*, 183 F.3d 598 (7th Cir.1999) ..................................................... 32

*Bismullah v. Gates*, 551 F.3d 1068 (D.C. Cir. 2009)............................................................. 30

*Brady v. Office of Sgt. at Arms*, 520 F.3d 490 (D.C. Cir. 2008)............................................ 35

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ............................. 47

*\*Department of Navy v. Egan*, 484 U.S. 518 (1988) ........................................................... 1, 8

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) .......................................................... 30

*Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635 (7th Cir. 2013) ............................................ 46

*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) ...................... 30

*Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999)....................................................... 32

*LaShawn v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) (en banc) ............................................. 27

*Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658 (D.C. Cir. 1994)................................... 30, 31

*McGrath v. Clinton*, 666 F.3d 1377 (D.C. Cir. 2012) .......................................................... 28

*Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986) ............................................................... 32

*Noviello v. City of Boston*, 398 F.3d 76 (1st Cir. 2005) ........................................................ 32

*Petit v. U.S. Dept. of Educ.*, 675 F.3d 769 (D.C. Cir. 2012) ................................................ 47

*Petitioner v. Dep't of the Interior*, 2014 WL 3788011 (EEOC 2014) ............................... 46, 47

*Porter v. Shah*, 606 F.3d 809 ............................................................................................ 26

*Rattigan v. Holder*, 604 F. Supp. 2d 33 (D.D.C. 2009) .............................................. 8, 40, 44

* Authorities chiefly relied upon are marked with asterisks.

*Rattigan v. Holder*, 636 F. Supp. 2d 89 (D.D.C. 2009) ........................................................ 8

*\*Rattigan v. Holder ("Rattigan I"),*
   643 F.3d 975 (D.C. Cir. 2011) ....................................1, 5, 6, 9, 10, 19, 22, 26, 28, 43, 47

*\*Rattigan v. Holder ("Rattigan II"),*
   689 F.3d 764 (D.C. Cir. 2012) ................ 2, 11-17, 21-23, 26, 28-31, 34, 36-39, 43, 51

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000) .................................................. 32

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006)........................................ 47

*Stewart v. St. Elizabeth's Hospital*, 589 F.3d 1305 (D.C. Cir. 2010) .......................... 26

*\*Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) .............18, 27, 44

*\*Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013) ......................................... 16, 29, 31, 33

*Vinson v. Taylor*, 753 F2d 141 (D.C. Cir. 1985)........................................... 32

*Zann Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013) .............................45, 46

**Statutes:**

28 U.S.C. § 1291 ............................................................................. 1
28 U.S.C. § 1331 ............................................................................. 1

42 U.S.C. § 2000e-3............................................................................ 47
42 U.S.C. § 2000e-3(a)......................................................................... 44
42 U.S.C. § 2000e-16.......................................................................... 47

**Rules:**

Fed. R. App. P. 4(a)(1) ........................................................................ 1
Fed. R. Civ. P. 56(d)..................................................................15, 20, 49

**Miscellaneous:**

Executive Order 12,968 ........................................ 1, 2, 4, 11, 12, 17, 18, 23, 28

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court granted the government's motion for summary judgment and entered a final judgment on October 1, 2013. JA 608-633. Plaintiff filed a notice of appeal on December 11, 2013, JA 634, which was timely under Fed. R. App. P. 4(a)(1). This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION AND STATEMENT OF THE ISSUES

In a prior appeal in this case, this Court reversed a jury verdict in favor of plaintiff Wilfred Rattigan on a retaliation claim against the FBI because that claim required the "jury to second-guess security judgments committed by law to FBI discretion." *Rattigan v. Holder*, 643 F.3d 975, 977 (D.C. Cir. 2011) ("*Rattigan I*"). The panel majority recognized that *Department of Navy v. Egan*, 484 U.S. 518 (1988), generally precludes judicial review of security clearance decisions by Executive Branch agencies, but concluded that this case presented an issue of first impression because Rattigan's security clearance was never revoked. In this unusual situation, the Court drew a distinction for purposes of *Egan* between agency officials with the "necessary expertise and training" to make security clearance decisions – here, employees in the FBI's Security Division – and other FBI employees, who are required to report potential security risks under Executive Order 12,968. *Rattigan I*, 643 F.3d at 983. Applying that novel distinction, the Court held that *Egan* did not necessarily preclude a claim that certain FBI "employees included in their referral accusations that they

knew or should have known were false or misleading," *id.* at 988, and remanded to allow Rattigan to pursue such a claim, while noting that the district court would need to proceed carefully in order to guard against the serious risk that this claim might still run afoul of *Egan*, *id.* at 989.

The government petitioned for rehearing and rehearing *en banc*, arguing that *Rattigan I* was contrary to *Egan* and would have significant adverse consequences because it would chill the necessary reporting of potential security risks to those officials charged with making security clearance determinations. The Court granted rehearing and issued another divided decision.

In *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012) ("*Rattigan II*"), the panel majority acknowledged the "likely chilling effect" its prior decision would have on security reporting under Executive Order 12,968, noting that it "presents serious *Egan* problems" because officials charged with making security clearance decisions "need full access to even unsubstantiated and doubtful information in order to make the sensitive, predictive judgments that *Egan* protects." *Id.* at 769. Rather than re-assessing its initial holding, however, the panel sought to "minimize" the admittedly "serious *Egan* problems" arising from its prior decision by adopting a "knowingly false" standard to govern claims in this context. Thus, the Court held that Rattigan may only proceed with his retaliation claim "if he can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they *knew to be false*." *Id.* at 770-71 (emphasis added). Although the Court

2

specifically found that many of the statements in the security report could not support a claim of knowing falsity, *id.* at 772, it concluded that "Rattigan may be able to prove" that two statements in the report were knowingly false, and thus remanded for the district court to determine in the first instance "whether there is sufficient evidence of knowing falsity to allow Rattigan to bring his claim before a jury," *id.* at 773.

Applying the "knowing falsity" standard on remand, the district court granted the government's motion for summary judgment. JA 608-632. The court held that Rattigan failed to establish genuine issues of material fact on two elements of his retaliation claim: that the FBI took a materially adverse action against him, and that the FBI took action against him *because of* his protected activity. JA 618. Stressing that employers are not generally liable for the acts of co-workers, the court found that none of Rattigan's supervisors knowingly reported false information to the FBI's Security Division. JA 618-23. The court also held that no reasonable jury could find that retaliatory animus, rather than legitimate security concerns, was the "but-for" cause of Rattigan's referral to the Security Division given the large number of statements in the referral that were indisputably true and the inability of a jury to determine – without violating *Egan* – whether the Security Division would have chosen to investigate absent the statements in the report alleged to be false. JA 623-29. Finally, the district court held that no further discovery was necessary to rule on the government's motion for summary judgment. JA 629-31.

The questions now presented on appeal are:

1.  Whether the district court correctly held that Rattigan failed to show that the FBI took a materially adverse action against him because there was no evidence from which a jury could reasonably conclude that relevant officials reported any information they knew to be false.

2.  Whether, in the alternative, the district court correctly held that a reasonable jury could not properly find that retaliatory animus, rather than legitimate security concerns, was the but-for cause of Rattigan's referral to the Security Division and the resulting investigation by the Division without running afoul of *Egan*.

3.  Whether the district court abused its discretion in denying Rattigan's request for broad, new discovery on the ground that such discovery was not necessary to rule on the government's summary judgment motion.

## RELEVANT STATUTES AND REGULATIONS

Executive Order 12,968 is attached as an addendum to this brief.

## STATEMENT OF THE CASE

The facts and procedural history of this case are set forth at length in this Court's two prior decisions in this case.  We summarize below only the critical background relevant to the issues presented in this appeal.

### A.    Relevant Facts.

Plaintiff Wilfred Rattigan was employed as the FBI's legal attaché in Riyadh, Saudi Arabia – a sensitive position that required a Top Secret security clearance.  In

that capacity, he functioned as the primary FBI liaison to the Saudi intelligence service, the Mabahith. Following the terrorist attacks on September 11, 2001, that position became more sensitive and important given the urgent need for increased intelligence-gathering activities in the Middle East.

Rattigan's immediate supervisor was Cary Gleicher, a Unit Chief in the FBI's Office of International Operations (OIO). Gleicher's supervisor was Michael Pyszczymuka, a Section Chief in OIO. Pyszczymuka's supervisor was Leslie Kaciban, Deputy Assistant Director of OIO. At various times, Rattigan made allegations of race and national origin discrimination against Gleicher, Pyszczymuka, and Kaciban. *See Rattigan I*, 643 F.3d at 978. Donovan Leighton was one of Rattigan's colleagues at OIO. Leighton had no supervisory authority over Rattigan, JA 82 (stipulated facts), and Rattigan never filed a charge of discrimination against Leighton.

In November and December of 2001, Leighton was assigned by Gleicher to work on a temporary detail in Riyadh. During that assignment, Leighton became concerned by a number of things he observed and heard about Rattigan that potentially raised security issues. *See Rattigan I*, 643 F.3d at 978 (summarizing security concerns). Upon his return to the desk duty at OIO, Leighton shared his concerns about Rattigan with an OIO supervisor, Pyszczymuka. JA 113-17. Leighton believed that he had a duty to raise his concerns, particularly in light of then-recent breaches of FBI security such as the Robert Hanssen case. JA 116-17. Leighton began drafting an electronic communication (EC) documenting his concerns. *Id.*

The EC drafted by Leighton, which spanned 18 pages, contained a mixture of personal observations, facts reported to him by others, and subjective judgments. JA 135-52. The EC noted, among other things, that:

> (1) Rattigan appeared on several occasions in the United States embassy in traditional Saudi Arabian national attire, which had been given to him by the head of the Mabahith, the Saudi intelligence service, and created the impression in the minds of some TDY staffers in Riyadh that Rattigan had "gone native," JA 137;

> (2) Rattigan's counterparts in the Mabahith were trying to find him a "suitable wife," which (coupled with the gift of Saudi clothing from the Mabahith) "raised a concern in SSA Leighton's mind that Legat Rattigan had less than an arm's length relationship with the Mabahith," JA 137;

> (3) Rattigan and his principal deputy, Gamal Abdel-Hafiz, appeared to be insufficiently active and involved in the PENTTBOMB investigation into the September 11, 2001 terrorist attacks, JA 137;

> (4) Rattigan took a lengthy leave of absence with Abdel-Hafiz to make a pilgrimage to Mecca (known as the Hajj), leaving no effective means to contact either of them except through the Mabahith, JA 141-42;

> (5) Rattigan prohibited temporary duty staff from interacting directly with the Mabahith, a prohibition that Leighton believed "might have been imposed to prevent TDY SAs from picking up information about Legat Rattigan's relationship with the Mabahith through routine, uncensorable contacts with Mabahith personnel," JA 144-45;

> (6) Rattigan and Abdel-Hafiz were insufficiently responsive and attentive to urgent leads forwarded to the Riyadh office, JA 147-51;

> (7) Leighton was told that Rattigan hosted wild parties at his residence, where he and other FBI agents had sex with women described as "nurses," who were described to Leighton (by Rattigan and others) in a manner suggesting "that the term 'nurses' was being used by Legat Rattigan as a euphemism for 'prostitutes.'" JA 136.

*See also Rattigan I*, 643 F.3d at 978 (summarizing concerns raised in EC).

Leighton provided a draft of the EC to Pyszczymuka, who asked Assistant Section Chief Walt Smith to review that draft.  JA 127-28.  Smith reviewed and commented on the EC.  JA 549.  Leighton revised the EC and gave a new version back to Pyszczymuka, JA 131, who then referred the final version of Leighton's EC to the FBI's Security Division for review, as required by FBI policies.  JA 132.[1]

Pyszczymuka did not undertake his own investigation to determine the accuracy of the information in Leighton's EC, and he had no direct knowledge of any of the information reported therein.  As Rattigan testified, "Pyszczymuka was never in Riyadh" and he had "no firsthand knowledge of anything that happened in Riyadh."  JA 166.  Neither of the other two supervisors against whom Rattigan had filed charges of discrimination had any meaningful involvement in the referral of the EC.  Kaciban did not see the EC and did not know where Pyszczymuka referred it.  JA 173.  And, when Leighton raised his concerns about Rattigan, Gleicher merely referred Leighton to Pyszczymuka and had no further involvement with the matter.  JA 121-24.

Upon receiving the referral documenting Leighton's concerns about Rattigan, Edward Shubert, Section Chief of the Security Division, decided to initiate a formal security investigation based on a combination of the "foreign influence" and

---

[1]  In addition to FBI policies, Executive Order 12,968 requires all agency employees with access to classified information, which includes *all* FBI employees, "to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security."  E.O. 12,968, § 6.2(b).

"personal conduct" concerns raised in the referral. JA 292-95. After conducting an investigation, the Security Division concluded that revocation of Rattigan's security clearance was not warranted. JA 568-71. During the pendency of the investigation, the terms and conditions of Rattigan's employment were not affected in any way.

### B.    Prior Proceedings.

Rattigan filed a lawsuit in 2004, raising dozens of discrimination and retaliation claims under Title VII. While the district court dismissed most of these claims in a series of rulings from 2006 to 2009, it denied the government's motion for summary judgment with respect to "the events surrounding the investigation of plaintiff by the FBI's Security Division." *See Rattigan v. Holder*, 604 F. Supp. 2d 33, 37 (D.D.C. 2009). Shortly before trial, the government filed a motion to dismiss, arguing that Rattigan's lone remaining retaliation claim – which challenged the initiation of the security investigation – was non-justiciable under *Department of Navy v. Egan*, 484 U.S. 518 (1988), because it would require the jury to second-guess judgments related to national security that are committed by law to the Executive Branch. The district court denied that motion, holding that Rattigan's retaliation claim would not involve any impermissible second-guessing of security-related decisions because the Security Division ultimately concluded that he was *not* a security risk. *See Rattigan v. Holder*, 636 F. Supp. 2d 89, 93-94 (D.D.C. 2009). After trial, the jury returned a verdict in Rattigan's favor. The district court denied the government's post-trial motions and the government appealed.

1. *Rattigan I.*

On appeal, the government again argued that Rattigan's retaliation claim predicated upon his referral to, and investigation by, the FBI's Security Division is non-justiciable under *Egan*. In a published decision, a divided panel of this Court (Judges Tatel and Rogers; Judge Kavanaugh, dissenting) vacated the jury verdict in Rattigan's favor because the retaliation claim required the "jury to second-guess security judgments committed by law to FBI discretion." *Rattigan I*, 643 F.3d at 977. The Court did not dismiss the case, however, because it found that Rattigan might still be able to proceed with a claim based solely on the referral of concerns to the FBI's Security Division. The Court agreed with the district court that where the Security Division ultimately makes a clearance decision that is "favorable" to a plaintiff, *Egan* does not necessarily bar judicial review of acts by FBI employees outside the Security Division, who "may from time to time refer matters to the Division." *Id.* at 982-83. Accordingly, the Court remanded to allow Rattigan to try to proceed on the theory that OIO's referral of security concerns to the Security Division was the materially adverse action. *Id.* at 986-87.

The Court cautioned, however, that such a claim would still raise serious *Egan* concerns, and that Rattigan therefore might not be able to proceed. Indeed, the Court explained, review of Rattigan's retaliation claim could violate *Egan* indirectly even if it focused exclusively on the security referral and not on the Security Division's decision to investigate. *See id.* at 987-88 (providing a "stylized hypothetical"

9

to illustrate this point). Despite the significant difficulties it recognized that the district court would likely encounter in attempting to segregate the inquiry into the legitimacy of OIO's referral from the inquiry into the legitimacy of the Security Division's decision to investigate, *id.* at 988, the Court remanded to allow the district court to consider whether Rattigan's retaliation claim could "proceed without running into *Egan*," *id.* at 989. The Court stressed that "limitations required to ensure compliance with *Egan* may make it impossible for some plaintiffs to mount evidence sufficient to allow a reasonable jury to believe retaliation had occurred," and that "[i]n such cases, the district court will need to enter judgment for the government." *Id.* [2]

The government filed a petition for rehearing and rehearing *en banc.* The panel granted the petition for panel rehearing (thereby mooting the petition for rehearing *en banc*), ordered the parties to file new briefs, and again heard oral argument.

2. *Rattigan II.*

On rehearing, the same panel issued another published decision narrowing the scope of any retaliation claim Rattigan could pursue on remand in light of the "serious *Egan* problems" the panel majority recognized that its prior decision would create. *See*

---

[2] Judge Kavanaugh dissented, arguing that the panel majority's "slicing and dicing of the security clearance process into reviewable and unreviewable portions is nowhere to be found in *Egan*, and does not reflect the essential role that the reporting of security risks plays in the maintenance of national security." *Rattigan I*, 643 F.3d at 990. He also predicted that the new line-drawing enterprise mandated by the Court "will create significant practical difficulties" for district courts attempting to navigate the majority's complicated instructions in future cases. *Id.* at 991.

*Rattigan II*, 689 F.3d at 769.  While adhering to its original holding "that *Egan's* absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees," *id.* at 768, the Court further narrowed its decision in response to the government's arguments – which the panel found "quite powerful" – that permitting Title VII claims predicated upon the allegedly discriminatory reporting of security concerns would have a serious chilling effect on necessary reporting under Executive Order 12,968, *id.* at 769.

Among other things, the Court agreed that its "earlier decision could indeed discourage critical reporting by permitting jurors to infer pretext based on their own judgment that the information reported was either unlikely to prove true or raised insufficiently weighty concerns." *Id.*  The Court recognized that "[s]uch a standard conflicts with Executive Order 12,968's expectation that employees will report even overheard rumors and small details that may ultimately prove irrelevant." *Id.* Moreover, the Court acknowledged that allowing jurors to review reporting decisions under a preponderance-of-the-evidence standard could also lead them to depart from the "clearly consistent" standard mandated by the Executive Order. *Id.* (citing *Egan*, 484 U.S. at 531).  Finally, the Court agreed "that the substantial burdens, loss of privacy, and public humiliation that accompany litigation could . . . have a serious chilling effect on individual employees." *Id.* (internal quotations and citations omitted).  The Court explained that "this likely chilling effect presents serious *Egan*

problems" because the Security Division needs "full access to even unsubstantiated and doubtful information in order to make the sensitive, predictive judgments that *Egan* protects." *Id.*

Rather than reconsidering the interpretation of *Egan* that gave rise to these "serious *Egan* problems," the Court sought to "minimize" them by announcing a new limitation on Title VII claims in this context. *Id.* at 770. Asserting that "Title VII claims based on *knowingly false* reporting present no serious risk of chill," *id.* (emphasis in the original), the Court stated that a "knowingly false standard" would not conflict with the reporting obligation in Executive Order 12,968 and would not require jurors to weigh the significance of information reported "or to second-guess the employee's determination that seemingly doubtful or insignificant information warranted reporting." *Id.* Because the only question under this standard is "whether the reporting employee actually knew at the time of the reporting that the information he provided was actually false," the Court concluded that concerns about conflicting evidentiary standards and a chilling effect on necessary reporting would be sufficiently alleviated. *Id.* The Court thus held that "Rattigan's Title VII claim may proceed only if he can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.* at 771.

Having staked out the narrow circumstances under which a challenge to a security referral might potentially proceed, the Court assessed the government's argument that no remand was necessary because the truth of the information

12

provided to the Security Division was undisputed.  The Court stated that "the government is certainly correct" with respect to "many of the allegations in Leighton's EC." *Id.* at 772.  Among other things, the Court found that it was undisputed that Rattigan "occasionally wore traditional Saudi clothing to the Embassy and that he restricted interactions between American temporary duty staff and Saudi intelligence personnel." *Id.*  While noting that Rattigan had provided explanations which could "indicate that OIO officials had little reason to believe that Rattigan's actions raised legitimate security concerns," the Court emphasized that this "has no relevance under the knowingly false standard" because it did not show that that relevant officials "referred factual information they knew to be false." *Id.*  Moreover, the Court noted that "[t]he same can be said of the allegations that Rattigan dressed in traditional Saudi clothing, that the Saudi intelligence service attempted to find him a wife, and that he could be contacted only through the Saudi intelligence service." *Id.*  In short, the Court expressly found that Rattigan could not pursue a claim of knowing falsity with respect to many of the statements in Leighton's EC.

Nevertheless, the Court concluded that Rattigan might be able to pursue allegations of knowingly false reporting with respect to two statements in the EC, having to do with wild parties hosted by Rattigan and possible prostitution by women euphemistically described as "nurses." *Id.* at 772-73.  Specifically, the Court speculated that "Rattigan may be able to prove that (1) no one 'told' Leighton that Rattigan hosted parties in which he and others engaged in sexual relations with

13

'nurses,' and that (2) because Leighton and other OIO officials knew that Rattigan's girlfriend and her co-workers were in fact nurses, the claim that circumstances suggested they might instead be prostitutes was knowingly false." *Id.* at 773. As to these two statements, the Court declined to decide "whether the record evidence is sufficient to allow a reasonable jury to conclude that Leighton or his OIO supervisors knowingly reported or referred false factual allegations to the Security Division." *Id.* Instead, having "set forth the knowingly false standard for the first time on appeal," the Court remanded for the district court to decide this issue in the first instance, "after permitting any necessary discovery." *Id.*[3]

## C. District Court's Decision On Remand.

On remand, the district court held a status conference to determine how to proceed. JA 33-80. At that hearing, the court repeatedly pressed Rattigan's counsel to specify what discovery he needed to address the narrow question this Court identified on remand: whether Leighton or his OIO supervisors knowingly reported false

---

[3] Judge Kavanaugh again dissented, explaining that the majority's analysis was only "slightly tweak[ed]," and "still suffers from a basic flaw." *Rattigan II*, 689 F.3d at 773. He reiterated that the majority's "slicing and dicing of the security clearance process into reviewable and unreviewable portions" is inconsistent with *Egan*. *Id.* at 773-74. He also stressed that "*Egan* protects the front end of the security clearance process – including reports of possible security risks – as much as it protects the back end." *Id.* at 775. Finally, Judge Kavanaugh took the unusual step of expressly inviting the government to seek rehearing *en banc*, stating that if the government files such a petition, "I will urge the full Court to grant it." *Id.* at 776. The full Court denied the government's petition for rehearing *en banc* in a 4-4 order, with Judges Dentelle, Brown, Griffith, and Kavanaugh noting that they would grant the petition.

information about Rattigan to the Security Division.  In response, Rattigan's counsel insisted that he was entitled to broad discovery to test the credibility of Leighton and Pyszczymuka in an effort to show that the *entire* report of security concerns was false. JA 75.  The district court rejected that request, expressing frustration that counsel refused to "accept the premises we're working on" because *Rattigan II* conclusively held that most of Leighton's EC was not false.  JA 75.  Thus, reiterating that the only relevant issue was "what parts, if any, of the referral itself are knowingly false," JA 76, the district court directed the government to file a motion for summary judgment while allowing plaintiff to identify specific discovery that was necessary to oppose that motion pursuant to Fed. R. Civ. P. 56(d).  JA 79.

The district court granted the government's motion for summary judgment.  JA 608-632.  After summarizing the lengthy factual and procedural history of this case and the narrow question presented for resolution on remand, the district court held that Rattigan failed to establish genuine issues of material fact on two elements of his retaliation claim:  (1) that the FBI took a materially adverse action against him, and (2) that the FBI took action against him *because of* his protected activity.  JA 618.

1.  The district court first held that Rattigan failed to identify a materially adverse action because no supervisor knowingly reported false information to the Security Division.  JA 618-23.  Explaining that this Court had held that "the OIO referral could qualify as materially adverse action under Title VII so long as 'Leighton or other OIO officials chose to report other information that they knew to be false,'"

15

JA 618 (quoting *Rattigan II*, 689 F.3d at 772), the district court stressed that Rattigan also had to show "that the individual taking this action was a supervisor for whom the employer is vicariously liable," JA 618-19. Applying the standard for employer liability under Title VII articulated in cases like *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013),[4] the court held that "the only relevant actor for purposes of plaintiff's retaliation claim is OIO Section chief Michael Pyszczymuka." JA 619. The court reached this conclusion because the other supervisors Rattigan accused of retaliation, Gleicher and Kaciban, had no meaningful involvement in the referral, JA 619-20, and Leighton, the author of the EC, "never served as [Rattigan's] supervisor," JA 620 (citing Rattigan's own concessions on this point). As for Pyszczymuka, the court found no evidence that he knowingly reported any false information based primarily upon Rattigan's own testimony that Pyszczymuka "had no firsthand knowledge of anything that happened in Riyadh" and simply forwarded "what someone else told him and what he believed." JA 620. *See also* JA 622 n.6.

Summarizing the evidence in the light most favorable to Rattigan, the district court explained that "[a]t most" it showed "that (1) Pyszczymuka knew that Leighton

---

[4] While recognizing that a co-worker's actions could provide a basis for employer liability under Title VII in appropriate circumstances (*e.g.*, where the employer was negligent in responding to allegedly unlawful behavior), the district court stressed that Rattigan "does not argue for the application of a negligence theory in this case," and noted that he could not do so without violating the "knowingly false" standard articulated in *Rattigan II*. JA 619 n.2. Instead, the court emphasized, Rattigan "implicitly accepts that supervisory liability is appropriate by arguing that Leighton's actions should be 'imputed' to his supervisors." *Id.*

16

drafted an EC identifying security concerns about plaintiff; (2) he encouraged Leighton to focus on security concerns; (3) he forwarded Smith's critiques to Leighton, and (4) he never personally investigated the truthfulness of the statements prior to referring the EC to the Security Division." JA 621. The court recognized, however, that under *Rattigan II*, "it is not enough that Pyszczymuka (or any other reporting employee) failed to independently investigate the truthfulness of statements made in the referral to the Security Division." *Id.* On the contrary, *Rattigan II* recognized that "a knowingly false standard is essential in the security clearance context" to ensure that the Security Division has "full access to even unsubstantiated and doubtful information" and that employees satisfy the mandate under Executive Order 12,968 to report "overheard rumors and small details that may ultimately prove irrelevant." JA 621-22 (quoting *Rattigan II*, 689 F.3d at 769) (internal quotations omitted). In light of Rattigan's concession that Pyszczymuka simply forwarded "what someone else told him and what he believed," the court suggested that the FBI might be entitled to summary judgment even under the less demanding "pretext" standard, but emphasized that this evidence was "certainly fatal to plaintiff's claim under *Rattigan II's* more demanding knowing falsity standard." JA 622 n.6.

The district court also rejected Rattigan's "novel theory that a non-supervisor's knowing falsities – in this case, the alleged knowing falsities of Donovan Leighton – must be imputed to his supervisor, Michael Pyszczymuka." JA 622. The court found that Rattigan failed "to offer any evidence that Leighton made false statements 'on

17

behalf and at the behest of' his supervisors," and that in any event "permitting a jury to reach such a conclusion would violate *Rattigan II*" by effectively transforming the "knowingly false" standard into the "pretext standard" that this Court specifically rejected. JA 623. Accordingly, the court found it "unnecessary to consider the specific allegations of Leighton's knowing falsity," JA 623 n.9, and focused exclusively on Pyszczymuka's knowledge. "Because it is undisputed that Pyszczymuka referred the EC without any knowledge of the truth or falsity of the allegations therein," the district court concluded that "he did not take a materially adverse action for which his employer is vicariously liable." JA 623-24.

2. In addition to concluding that Rattigan failed to identify any materially adverse action, the district court held, in the alternative, that no reasonable jury could find that retaliatory animus was the "but-for" cause of Rattigan's referral to the Security Division. JA 624-29. Citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), the district court explained that the question it "must consider on remand is whether a reasonable jury could find that plaintiff's protected activities were the *but for cause* of the defendant's allegedly adverse action without running afoul of *Egan* and Executive Order 12,968." JA 624 (emphasis in the original). The court then concluded that Rattigan could not demonstrate that retaliatory animus was the but-for cause of the security referral given this Court's "holding that a number of allegations in the referral were not knowingly false, but were objectively true." JA 625. The court gave a number of reasons for this conclusion.

18

First, the court explained, "if a jury were to evaluate whether the reason the EC was referred was retaliation, that assessment would necessarily allow the jury to second-guess the Security Division's conclusion, as testified by Shubert, that the issue of foreign influence warranted further investigation." JA 625. Second, the court stressed that a "jury should not be permitted to parse the EC," because "[w]here the Security Division chose to investigate, at least in part, on the basis of particular statements in the EC that are admittedly true, it necessarily follows that plaintiff cannot prove causation without violating *Egan*." JA 626. Third, the court noted that "it is not possible based on the record in this case for a jury to find that plaintiff's alleged damages resulted from the referral of the EC, as opposed to the investigation itself" because "a jury cannot realistically be expected to perform the mental gymnastics of determining what damages were caused by the referral and what were caused by the investigation." JA 626-27. The district court reiterated that this Court charged it with the important task of ensuring that a jury not second-guess the Security Division's decision to initiate an investigation, JA 627 (citing *Rattigan I*, 643 F.3d at 987), and concluded that, given the very short time between the referral and the start of the Security Division's investigation "any alleged damages would necessarily implicate the Security Division's decision to investigate," *id.*

Finally, the district court explained, "under the Supreme Court's recent ruling in *Nassar*, it is now clear that a Title VII retaliation claim cannot rely on a mixed motive theory." JA 628. Because it is undisputed "that the referral included true

19

statements that raised legitimate security concerns," the court held that Rattigan could not proceed on his retaliation claim after *Nassar*. Rejecting Rattigan's contention that the existence of even one false statement in the referral should permit a jury to conclude that retaliation was the but-for cause of the referral under *Nassar*, the court stressed that "[p]laintiff's alleged damages arose not from individual statements in the EC, but from the referral itself." JA 628-29. The court then held that, "[u]nder *Nassar*, the existence of true allegations implicating legitimate security concerns make it impossible for a jury to find that the EC would not have been referred but-for retaliatory animus." JA 629. Thus, although it may have been sufficient at the time this Court decided *Rattigan II* for a jury to "conclude that the motivations for referring the EC were mixed," the district court held that "since *Nassar*, it clearly is not." *Id.*

3.  The district court also held that no further discovery was necessary to rule on the government's motion for summary judgment. JA 629-31. The court explained that, during the hearing it held to determine what discovery (if any) was necessary, "plaintiff proposed vague and boundless discovery" beyond the scope of the narrow questions presented on remand and "repeatedly asserted the need for information on what OIO officials should have known." JA 630. As a result, the court "decided that it was best to proceed by allowing the defendant to file its summary judgment motion first" while allowing Rattigan to file an opposition with an affidavit under Fed. R. Civ. P. 56(d) detailing any necessary discovery. *Id.*

The court then held that none of the proposed areas of discovery outlined in the declaration filed by Rattigan's counsel was necessary to rule on the summary judgment motion. JA 631. With respect to supervisory liability, the court held that there was no dispute that Pyszczymuka was Rattigan's supervisor (and Leighton was not); that Pyszczymuka did not know the truth or falsity of the allegations in the EC; and that Rattigan "had every opportunity and incentive to explore what Pyszczymuka knew or did not know during prior discovery and at trial." *Id.* The court also held that "no further discovery regarding knowingly false statements" was necessary given this Court's prior finding "that the referral included true statements identifying legitimate security concerns," which precluded a jury from reasonably concluding that retaliation was the "but-for" cause of the referral under *Nassar. Id.*

## SUMMARY OF ARGUMENT

In its prior decisions in this case, this Court recognized that allowing claims predicated upon allegedly discriminatory reporting of security concerns "presents serious *Egan* problems" because it would chill the reporting of information mandated under Executive Order 12,968 that is necessary for Executive Branch officials "to make the sensitive predictive judgments that *Egan* protects." *Rattigan II*, 689 F.3d at 769. Accordingly, this Court significantly narrowed the type of claim available in this context, holding that "Rattigan's Title VII claim may proceed only if he can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.* at 771. Having established this

21

narrow path forward, this Court instructed the district court "to determine in the first instance whether there is sufficient evidence of knowing falsity to allow Rattigan to bring his claim before a jury," *id.* at 773, while also ensuring that his claim did not violate *Egan*, *see Rattigan I*, 643 F.3d at 989.

On remand, the district court dutifully exercised the gatekeeping functions this Court assigned to it and held that the government was entitled to summary judgment on Rattigan's retaliation claim.  First, the court held that Rattigan failed to present any evidence that any of his supervisors reported information to the Security Division that they knew to be false.  JA 618-23.  Second, the court held, in the alternative, that no reasonable jury could find that retaliatory animus (rather than legitimate security concerns) was the "but-for" cause of the challenged referral to the Security Division without running afoul of *Egan* and the specific limitations established in this Court's prior decisions.  JA 623-29.  None of Rattigan's arguments on appeal compel reversal of the district court's well-reasoned decision.

1.  Rattigan first argues (Pl. Br. 25-43) that the district court erred in holding that the FBI may only be held vicariously liable for knowingly false information reported by a supervisor.  As the district court noted, however, Rattigan accepted the basic proposition that employers are not generally liable for discriminatory conduct by co-workers, *see* JA 619 n.3, and there is no dispute that Leighton was not Rattigan's supervisor.  Although Rattigan now suggests that the standards for supervisory liability the Supreme Court recently clarified in *Vance* do not apply to cases involving

retaliatory harassment, he has waived that argument by not pressing it in district court. More fundamentally, that argument lacks merit, as it is contrary to well-settled limits on employer liability under Title VII for the acts of non-supervisory employees.

In the alternative, Rattigan also contends that the district court erred in focusing exclusively on Pyszczymuka's knowledge in assessing knowing falsity. Rattigan argues primarily that Pyszczymuka colluded with Leighton to report allegations that the two of them collectively should have known were false.  But the district court properly rejected this attempt to "impute" Leighton's alleged knowledge to Pyszczymuka, stressing that the relevant inquiry mandated by this Court is "what a particular person knew at a particular time."  JA 623 (quoting *Rattigan II*, 689 F.3d at 771).  Quite apart from the knowing falsity limitation, Rattigan provides no legal support for his novel theory that adverse actions may properly be imputed to other employees based on a collusion theory.  In any event, the district court correctly found that there was no evidence that Leighton was acting "at the behest of" his supervisors.  Finally, the court properly concluded that the undisputed evidence (including Rattigan's own testimony) showed that Pyszczymuka had no firsthand knowledge regarding the truth or falsity of the statements made in the EC but rather "believed" that information and passed it along to the Security Division, as required under Executive Order 12,968.

In any event, even if knowingly false reporting by a mere co-worker such as Leighton could somehow provide a basis for holding the FBI vicariously liable (even

though the agency promptly investigated those allegations), there is no evidence from which a reasonable jury could conclude that Leighton reported any factual information he knew to be false.  In *Rattigan II,* this Court specifically held that many of the statements in Leighton's EC were undisputed and could not support a claim of knowing falsity, but left open the possibility that Rattigan might be able to prove that two concerns raised in the EC – about wild parties at Rattigan's house and possible prostitution by women described as "nurses" – were knowingly false.  Nevertheless, Rattigan's opening brief focuses primarily on statements this Court has already held cannot support a claim of knowing falsity.  *See* Pl. Br. 37-43 (challenging statements regarding Rattigan's involvement in the PENTTBOMB investigation, his lengthy absence from the office to participate in the Hajj, his handling of high priority leads, his wearing of Saudi attire, and his prohibition of interactions between TDY staff and the Mabahith).  None of these arguments is relevant to the narrow issues remanded by this Court, and Rattigan identifies no evidence from which a jury could reasonably conclude that Leighton wholly fabricated his concerns about wild parties at Rattigan's house and possible prostitution.

2.  Rattigan also contends (Pl. Br. 43-53) that the district court erred in holding that the government was entitled to summary judgment on the independent ground that a jury could not reasonably conclude that retaliation was the "but-for" cause of the referral (as required under *Nassar*) without impermissibly second-guessing protected judgments in violation of *Egan*.  Among other things, Rattigan argues that a

24

jury could properly conclude that no security referral would have been made based

solely on the statements in the EC that were undeniably true and thus find that the

few "false" statements made for allegedly retaliatory reasons were the "but-for" cause

of the referral.  Pl. Br. 47.  As the district court recognized, however, "the existence of

true allegations implicating legitimate security concerns make it impossible for a jury

to find that the EC would not have been referred but-for a retaliatory animus."  JA

629.  In order to determine whether the referral would have been made in the absence

of any purported knowing falsity contained therein, the jury would inevitably need to

assess the relative significance and validity of the reported security concerns that are

indisputably true and would thus invariably call into question the Security Division's

judgment that such concerns warranted investigation.

   3.  Finally, Rattigan argues (Pl. Br. 54-58) that the district court abused its

discretion in rejecting his requests for broad discovery to explore a variety of new

issues on remand.  As explained more fully in Section III, *infra*, however, the district

court applied the proper legal standards and acted well within its considerable

discretion in concluding that none of the additional areas of discovery proposed by

Rattigan was necessary to resolve the narrow claim remaining on remand.

## STANDARD OF REVIEW

This Court reviews a district court decision granting summary judgment *de novo*. *Stewart v. St. Elizabeth's Hospital*, 589 F.3d 1305, 1307 (D.C. Cir. 2010). The district court's denial of a request for additional discovery is reviewed solely for abuse of discretion. *Porter v. Shah*, 606 F.3d 809, 814 (D.C. Cir. 2010

## ARGUMENT

Although this Court rejected the government's argument in the prior appeal that *Egan* precludes Title VII claims predicated upon the allegedly discriminatory reporting of security issues, it recognized that the chilling effect from allowing such claims "presents serious *Egan* problems." *Rattigan II,* 689 F.3d at 769. Accordingly, the Court imposed stringent requirement for such claims, holding that they may proceed only if the plaintiff "can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they *knew to be false.*" *Id.* at 771 (emphasis added). The Court also made clear that even claims proceeding under this heightened standard of proof would not be able to proceed where they required a jury to second-guess predictive judgments about national security risks of the sort that *Egan* commits exclusively to the Executive Branch. *See Rattigan I,* 643 F.3d at 989. The Court thus instructed the district court to ensure that the narrow claim of knowing falsity it was allowing on remand did not call into question judgments of the FBI's Security Division protected under *Egan.*

The district court has now fulfilled this Court's twin mandates to (1) assess the sufficiency of Rattigan's evidence of knowing falsity on two issues, and (2) determine whether his claim could proceed without running afoul of *Egan*.  The court correctly concluded that Rattigan failed to present sufficient evidence from which a reasonable jury could conclude that any of his supervisors reported information to the Security Division that they knew to be false.  The court also correctly held that, given the many statements in the referral that were true and independently merited investigation by the Security Division, a jury could not reasonably conclude that retaliation (rather than legitimate security concerns) was the "but-for" cause of the referral, as required under *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

On appeal, Rattigan challenges each of these holdings, as well as the district court's denial of additional discovery, and we demonstrate in Sections I-III below that these arguments lack merit.  But Rattigan also advances a policy argument that the "knowing falsity" standard is "unworkable" and should be abandoned.  Pl. Br. 58-62. In twice seeking rehearing in the prior appeal, the government expressed similar concerns about the "workability" of the knowing falsity standard – albeit for different reasons.  However, this Court's decisions in the prior appeal are binding precedent, and the district court has now faithfully applied the knowing falsity standard on remand.  Rattigan cannot now ask a panel of this Court to overrule prior decisions by a three-judge panel, *see LaShawn v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc), and he does not explicitly argue that the *en banc* Court should consider this

issue. As a result, Rattigan's contention that the Court should abandon the

"knowingly false" standard for security referrals is not properly before this Court.[5]

## I.    THE DISTRICT COURT CORRECTLY HELD THAT RATTIGAN FAILED TO SHOW THAT RELEVANT FBI OFFICIALS REPORTED ANY INFORMATION ABOUT HIM THAT THEY KNEW TO BE FALSE.

In an ordinary relation claim, the plaintiff bears the burden of showing "(1) that

he opposed a practice made unlawful by Title VII; (2) that the employer took a

materially adverse action against him; and (3) that he employer took the action

'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377,

1380 (D.C. Cir. 2012). In light of the unique *Egan* concerns raised by challenges to

security referrals, however, this Court imposed a significant limitation on claims in

---

[5] To the extent the Court elects to treat Rattigan's argument as a request for rehearing *en banc*, the government would welcome the opportunity to address this issue. For the reasons outlined in our two prior petitions for rehearing *en banc*, and those expressed by Judge Kavanaugh in his dissenting opinions, *see Rattigan II*, 689 F.3d at 773-76; *Rattigan I*, 643 F.3d at 989-992, the government continues to believe that allowing Title VII claims predicated upon allegations that an employee reported information he knew to be false is contrary to *Egan*, will invariably chill necessary security reporting under Executive Order 12,968, and will create significant practical difficulties in future cases as courts attempt to draw lines between reviewable and unreviewable security-related decisions. Indeed, we believe that this Court's decisions in *Rattigan I* and *II* are already beginning to cause confusion and unintended results in the lower courts, thus bearing out what Judge Kavanaugh predicted in his dissenting opinion: that the Court's "slicing and dicing of the security clearance process into reviewable and unreviewable parts," *Rattigan I*, 643 F.3d at 989, "will create significant practical difficulties" for district courts attempting to follow the Court's instructions or remand, *id.* at 991. As explained below, however, the district court here successfully threaded the needle through the many *Egan* concerns at issue in this case and properly recognized the higher evidentiary burdens Rattigan had to satisfy to establish retaliation and the limited methods of proof he could use to support that claim without violating *Egan*.

this context, holding that a security referral is potentially actionable only if the plaintiff "can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Rattigan II*, 689 F.3d at 771. The district court correctly held that Rattigan failed to make this showing.

## A. The District Court Properly Held That None Of Rattigan's Supervisors Knowingly Reported False Information To The Security Division.

1. In considering whether there was any evidence from which a jury could properly conclude that Rattigan's referral to the Security Division was based on "knowingly false" information, the district court first identified the relevant officials that could subject the FBI to vicarious liability for false reporting. The court explained that Rattigan "not only must identify an allegedly adverse action, he must also present sufficient evidence that the individual taking the action was a supervisor for whom his employer is vicariously liable." JA 618-19. Citing *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2442 (2013), the court explained that employers are generally only liable under Title VII for the acts of their supervisors. JA 619. Based on Rattigan's own admissions, the court held that Leighton was not Rattigan's supervisor and that "the only relevant actor for purposes of plaintiff's retaliation claim is OIO Section Chief Michael Pyszczymuka." JA 619. On appeal, Rattigan advances several arguments that the district court erred in focusing solely on Pyszczymuka for purposes of the knowing falsity inquiry. Pl. Br. 25-32. None has any merit.

For example, Rattigan contends that this Court's shorthand references to "Leighton or his OIO supervisors" at various points in its decision, *see, e.g., Rattigan II*, 689 F.3d at 773, compel the conclusion that Leighton's actions can be imputed to the FBI for purposes of Title VII liability. Pl. Br. 25. But the issue of vicarious liability was never raised or considered in the prior appeal, and this Court thus had no basis or reason to distinguish Leighton from OIO supervisors. In such circumstances, this Court cannot be deemed to have decided the vicarious liability issue. *See, e.g., Bismullah v. Gates*, 551 F.3d 1068, 1071 (D.C. Cir. 2009) (explaining that issue "was not presented, granted, or briefed and the Court had no occasion to decide it"); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182 (1979) (same). There is also no indication that, in adopting a knowing falsity standard in this context, this Court intended to supplant other established limitations on employer liability.

Rattigan also suggests that principles in *Vance* and other cases generally limiting vicarious employer liability to actions by supervisors, *see, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 791 (1998), do not apply to retaliation cases. Pl. Br. 27 ("it is doubtful that *Vance* applies to this retaliation case"). This argument is both waived and wrong. It is waived because Rattigan never made that argument below. *See, e.g., Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 663 (D.C. Cir. 1994). Indeed, the district court relied upon this waiver in its decision, noting that Rattigan "implicitly accepts that supervisory liability is appropriate by arguing that Leighton's actions should be 'imputed' to his supervisors." JA 619 n.3. Nor did Rattigan argue that Leighton's

actions as a co-worker should be attributed to the FBI under a negligence theory, even assuming such a theory could apply in this context. *Id.* (noting that Rattigan "does not argue for application of a negligence theory").

In any event, the district court correctly pointed out that any attempt to attribute the alleged false statements in Leighton's EC to the FBI under a negligence theory would violate the knowing falsity standard. *Id.* (citing *Rattigan II*, 689 F.3d at 768-770). And, far from being negligent, the FBI did precisely what a responsible employer is supposed to do – indeed, is required to do under Executive Order 12,968 – upon receiving a report of potential security concerns: it referred the report for possible investigation by the proper agency officials, the Security Division.

Quite apart from being waived, Rattigan's belated contention that decisions like *Vance* do not apply to retaliation cases is wholly without merit. Although *Vance* involved a hostile work environment claim (like *Faragher*), the principles of vicarious liability the Supreme Court clarified in that case apply equally to retaliation claims based upon a discrete incident, such as the allegedly false referral here. Under Rattigan's view, all knowingly false security reports made by *any* agency employees, no matter how low-level, would be attributable to the FBI. But this attempt to impose strict employer liability in the unique context of security reporting (where breathing room for potentially erroneous statements is most needed) is unprecedented and wrong. The general rule confining vicarious liability to acts of supervisors reflects Congress's intent "to place some limits on the acts of employees for which employers

31

under Title VII are to be held responsible," *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986), and it well-established that co-workers "differ radically from supervisors in the scheme of vicarious liability," *Vinson v. Taylor*, 753 F2d 141, 147 n.45 (D.C. Cir. 1985). No principled basis exists for ignoring this important limitation in cases where a plaintiff asserts a discrete act of retaliation rather than an ongoing series of acts that may rise to the level of a hostile work environment. If anything, the limitations on employer liability for actions by mere co-workers should be greater in single-act retaliation cases than in hostile work environment cases since an employer can more easily identify and control ongoing conduct than a discrete act of retaliation.

Rattigan suggests (Pl. Br. 28) that there is a qualitative difference between hostile work environment claims and retaliation claims predicated on a discrete act of knowingly false reporting. As explained above, however, the novel distinction he seeks to draw for purposes of employer liability finds no support in logic or the case law. On the contrary, numerous courts have analyzed false complaint and reporting claims as part of a hostile work environment claim. *See, e.g., Noviello v. City of Boston*, 398 F.3d 76, 93 (1st Cir. 2005) (noting that "the case law recognizes that false accusations of misconduct can contribute to the creation of a hostile work environment"); *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000); *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999); *Aviles v. Cornell Forge Co.*,183 F.3d 598, 606 (7th Cir.1999). In short, Rattigan's arguments that the district court erred in holding that the supervisory liability principles in *Vance* apply to this case, and thus concluding

32

that Pyszczymuka was the only relevant actor for purposes of the knowing falsity inquiry, fail on multiple grounds.

2. Rattigan also argues (Pl. Br. 28-32) that the district court misapplied *Vance* in a variety of ways. These arguments fare no better.

Rattigan first contends that the district court erred in finding that Leighton was not his "supervisor" within the meaning of *Vance* because the court based that finding on statements "made long before *Vance* was decided." Pl. Br. 28. But Rattigan also conceded that Leighton was not his supervisor in response to the government's motion for summary judgment, *see* JA 620 (citing Pl's Opp. to Def's Stmt of Material Facts), which was filed after *Vance* was decided. In any event, given Rattigan's own, unqualified admission that Leighton had no supervisory authority over him whatsoever, *see* JA 108 (explaining that OIO desk officers are "not our bosses"), Leighton would not qualify as a "supervisor" under any definition of that term. *See Vance*, 133 S. Ct. at 2443-46 (discussing different proposed definitions of that term). Rattigan identifies no reason to question the accuracy of these concessions now.

Unable to show that Leighton was a supervisor for whom the FBI could be held vicariously liable, Rattigan advances a novel theory (Pl. Br. 28) that Leighton acted in concert with various OIO supervisors, including Gleicher, Pyszczymuka, Smith, and Kaciban, to refer false allegations to the Security Division. But this attempt to impute Leighton's alleged knowledge to Pyszczymuka and other OIO supervisors is foreclosed by *Rattigan II*. As the district court explained, this Court

33

"held that a jury may only consider 'what a *particular person knew* at a particular time and whether *that person* intentionally reported false information about a co-worker.'" JA 623 (quoting *Rattigan II*, 689 F.3d at 771) (emphasis in the district court's decision). On appeal, Rattigan nowhere addresses this point, and he has thus waived any challenge to the district court's holding that *Rattigan II* precludes any attempt to impute Leighton's knowledge to Pyszczymuka or other OIO supervisors.

In any event, the district court also found that there was no "evidence that Leighton made false statements 'on behalf of and at the behest of' his supervisors." JA 623. Specifically, the court found that "plaintiff has failed to identify any evidence that Leighton's supervisors instructed him to investigate Rattigan's behavior, draft the EC, or what allegations to include." JA 623 n.7. Rattigan challenges these findings, and offers a lengthy description of evidence (largely without any cites to the record) that he believes demonstrates nefarious involvement by various OIO supervisors in the drafting and referral of Leighton's EC. *See* Pl. Br. 29-32. But nothing in this description of the EC's preparation (which is largely undisputed) demonstrates any firsthand knowledge by any supervisor about any of the statements in the EC. Nor is there any evidence from which a jury could reasonably conclude that OIO supervisors colluded with Leighton to refer allegations they knew to be false to the Security Division. While there is no doubt that Leighton consulted with Pyszczymuka regarding the preparation of the EC, and received comments provided by Walter Smith, that alone is an insufficient basis for a jury to properly find "that all four OIO

supervisors were acting in concert, and with Leighton to manufacture and refer allegations they knew to be false," as Rattigan now argues. Pl. Br. 32. In sum, Rattigan's arguments that the district court erred in holding that Pyszczymuka was the only relevant actor for purposes of the knowing falsity inquiry fail at every turn.

3. As a last resort, Rattigan also contends that, "[e]ven if Pyszczymuka were the only relevant supervisor," there was ample evidence that he knew at least some of the statements in the EC were false. Pl. Br. 33. This argument is wholly unsupported and directly contrary to the evidence. Nowhere does Rattigan identify any factual statement in the EC that Pyszczymuka supposedly knew was false. On the contrary, as the district court noted, JA 620, Rattigan specifically testified that Pyszczymuka "had no firsthand knowledge of anything that happened in Riyadh," and simply reported "what someone else told him and what he believed." JA 166. In light of this unequivocal concession, the district court properly concluded that "there is no evidence to support an inference that plaintiff's supervisor knowingly referred false statements to the Security Division." JA 621.

Rattigan objects to the district court's reliance on his own testimony, arguing that it "could not establish what Pyszczymuka knew or not." Pl. Br. 33. This argument cannot be squared with *Brady v. Office of Sgt. at Arms*, 520 F.3d 490 (D.C. Cir. 2008), which rejected claims of "pretext" given the plaintiff's testimony in that case that the supervisor in question "believed" the negative information about plaintiff. *Id.* at 496. It is not clear why Rattigan believes his own sworn testimony cannot similarly

35

shed light on the extent of Pyszczymuka's knowledge under the more demanding "knowing falsity" standard applicable here. In any event, given the absence of *any* evidence to the contrary, Rattigan's concession that Pyszczymuka had no firsthand knowledge of the allegations in the EC is dispositive.[6]

Unable to identify any evidence that Pyszczymuka knew that anything in the EC was false, Rattigan suggests that his "'belief' about the truth of the EC's allegations was unreasonable at best." Pl. Br. 34. But this is an attempt to impose liability under a "knew or should have known" standard, which this Court specifically rejected in favor of a knowing falsity standard. *See Rattigan II*, 689 F.3d at 770. As the district court summarized, "it is not enough that Pyszczymuka (or any other reporting employee) failed to independently investigate the truthfulness of statements made in the referral to the Security Division." JA 621.

In sum, the district properly held that there was no evidence from which a jury could reasonably conclude that any FBI supervisor reported false information to the Security Division and that Rattigan therefore failed to demonstrate that the FBI took materially adverse action against him.

---

[6] Rattigan's contention that his own testimony cannot establish what Pyszczymuka knew stands in considerable tension with his later argument that the district court erred in failing to consider his testimony to conclude that Leighton knew some of the statements in the EC were false. *See* Pl. Br. 43.

### B.    Leighton Did Not Knowingly Report False Information.

Because the district court concluded that there was no evidence that any FBI supervisor reported false information to the Security Division, it did not consider Rattigan's allegations that Leighton (an OIO desk officer who was not Rattigan's supervisor) knowingly reported false information about him to the Security Division. JA 623 n.9.  As the district court noted, Rattigan never argued that the FBI should be held liable for retaliatory harassment by a co-worker such as Leighton under a negligence theory, JA 619 n.3, and it is clear that such a claim would fail in any event. There is thus no need for this Court to consider Rattigan's argument that Leighton reported facts that he knew were false.  *See* Pl. Br. 34-43.  In the event the Court reaches this issue, however, it should reject that argument.

As an initial matter, any false statement knowingly included by Leighton in the EC would not be actionable because Rattigan has identified no evidence that Leighton (who was never the target of Rattigan's discrimination complaints) harbored any retaliatory animus toward Rattigan.  On the contrary, Rattigan's counsel told the jury that it was impossible to tell what Leighton's motives were.  Trial Tr. (7/21/09 AM), at 19 ("Now we don't know why Mr. Leighton did what he did eventually").  Thus, Rattigan cannot proceed with a knowing falsity claim based on Leighton's action even if Leighton's co-worker status did not preclude such a claim.  *See Rattigan II*, 689 F.3d at 771 (requiring evidence that employee "acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false").

37

In any event, Rattigan failed to show that any of Leighton's statements satisfied the rigorous knowing falsity standard, which requires a showing that the statements were "outright lies," *e.g.*, statements that Leighton "actually knew" at the time were "actually false." *Rattigan II*, 689 F.3d at 771. As noted above, this Court previously found that many of the statements in Leighton's EC could not support a knowing falsity claim. *Id.* at 772. This Court held that Rattigan could not pursue such a claim with respect to statements in the EC concerning Rattigan's appearances at embassy functions wearing Saudi attire; his restrictions on interactions between temporary duty personnel and the Mabahith; his management of the Riyadh office; his absence from the office to participate in the Hajj, during which time he could only be contacted through the Mabahith; and the efforts of the Mabahith to find him a "suitable wife." *Id.* However, this Court concluded that two statements in the EC might support such a claim: (1) Leighton's statement that he "was told" about parties at which Rattigan and certain others had sex with nurses, and (2) his statement that a combination of circumstances suggested to him that the term "nurses" may have been used as a euphemism for prostitutes. *Id.* at 773. *See also* JA 136 (relevant statements in EC).

Despite the exceedingly narrow focus of this Court's remand order, Rattigan's opening brief focuses almost entirely on the many statements in the EC that this Court has already held cannot support a claim of knowing falsity. *See* Pl. Br. 37-43 (disputing statements regarding Rattigan's involvement in the PENTTBOMB investigation, his lengthy absence from the office to participate in the Hajj, his

38

handling of high priority leads, his wearing of Saudi attire, and his prohibition of interactions between TDY staff and the Mabahith). None of these arguments falls within the scope of this Court's limited remand, and we therefore do not respond to them. With respect to the two statements that this Court stated "might" support a claim of knowing falsity, Rattigan identifies no evidence from which a jury could reasonably conclude that Leighton reported information that he knew to be false.

In lieu of evidence, Rattigan first contends that "this Court has already concluded that there is adequate evidence to find that the allegations regarding parties and prostitutes were knowingly false." Pl. Br. 35. That is simply wrong. As explained above, this Court expressly declined to decide that issue, choosing instead to leave it to the district court on remand. *See Rattigan II*, 689 F.3d at 773. *See also id.* at 772 (noting that there "may be" evidence to support such a claim). This Court apparently concluded that the evidence before it at the time was insufficient to compel a ruling one way or the other with respect to these statements and thus remanded for the district court to address that issue in the first instance. *Id.* at 773.

As this Court made clear in *Rattigan II*, it was Rattigan's burden to come forward with affirmative evidence showing that Leighton actually lied about being "told" that Rattigan hosted parties in which FBI personnel had sex with nurses and lied about having suspicions that the "nurses" were actually prostitutes. The sum total of the evidence Rattigan offers on these critical issues, however, is a statement by one of the sources Leighton cited for this information, Joseph Manarang, denying any

knowledge of these facts, *see* Pl. Br. 35-36 (citing JA 212), and a statement by the Security Division investigator, Cheryl Tucker, that interviews of temporary duty staff "failed to support Leighton's assertion that the women described as 'nurses' were prostitutes," *id.* at 36 (citing JA 193). These two statements, standing alone, simply do not provide an adequate basis for a jury to conclude that Leighton lied about what he was told or what he suspected. Even assuming Manarang's denial of knowledge about inflammatory facts during a Security Division investigation suggests that *he* did not tell Leighton about wild parties at Rattigan's residence attended by nurses this does not demonstrate that Leighton lied about being "told" about such events, much less that he lied about having suspicions that the nurses were really prostitutes.

Moreover, ample record evidence now corroborates that Rattigan hosted parties at his house that were attended by nurses. For example, Rattigan's wife, Luanne Manneson (who married him in 2008), testified that she was a nurse working in Saudi Arabia when she met Rattigan and lived with other female hospital employees in a compound where they were not allowed to socialize. JA 156-57. Manneson further testified that she hosted parties at Rattigan's house attended by FBI personnel and other nurses. JA 159. ███████████████████████████████

███████████████████████████████████[7] In light of this evidence

---

[7] ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

*Continued on next page.*

independently corroborating significant details in Leighton's EC, a jury could not properly conclude that Leighton outright lied in stating that he was "told" that Rattigan hosted parties where FBI employees had sex with nurses.

Likewise, there is no evidence from which a jury could reasonably conclude that Leighton lied when he expressed a suspicion "that the term 'nurses' was being used by Legat Rattigan as a euphemism for 'prostitutes.'" JA 136. Notably, Rattigan attempted to prove at trial that Leighton knew that Rattigan's then-girlfriend, Luanne Manneson, was a nurse and that his statement that the nurses at the parties at his house might be prostitutes was knowingly false. Of course Leighton's knowledge that Manneson was in fact a nurse would not foreclose the possibility that some women who attended parties at Rattigan's residences were called nurses but were actually prostitutes. However, Rattigan failed to establish the basic factual predicate for the attenuated inference he claims a jury could make. Rattigan's counsel acknowledged during the trial that Leighton never met Manneson. JA 176. Moreover, Rattigan testified that he never introduced Leighton to Manneson, JA 300-01, and generally had only minimal contact with Leighton, JA 105. In short, there is no evidence to

Although Rattigan suggests that it was "unfair" for the district court to accept this evidence while denying him additional discovery, Pl. Br. 36 n. 7, it is difficult to see what discovery Rattigan would need about his own prior statements.

suggest that Leighton knew Rattigan was dating an actual nurse at the time let alone to

conclude that Leighton knew the nurses at the parties were not prostitutes.

    Moreover, there is affirmative evidence supporting Leighton's inference that

the nurses might be prostitutes and foreclosing any argument that he fabricated this

concern.  For example, ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

Leighton could easily have developed similar suspicions based on the information

available to him at the time.  Leighton noted in his EC that the "nurses" were foreign

nationals from the Philippines, Pakistan, and Bangladesh, JA 136, and later testified

that he understood that women from these countries were frequently used as

prostitutes in Saudi Arabia, JA 183.  And it is true that foreign nationals from these

and other countries are used as prostitutes in Saudi Arabia.  JA 186-87 (Department

of State, Trafficking in Human Persons Report).

    Other evidence further corroborates Leighton's concerns.  For example, Joseph

Manarang, one of the individuals Leighton identified as a source of information for

his report, reported to the Security Division that he was aware of instances in which

Rattigan directed Eric Mina (a driver for the FBI) to pick up women from a nearby

compound and bring them back to Rattigan's residence.  JA 212.  Whatever Mina was

doing, it raised enough red flags for Manarang that "he cautioned Mina about possibly

doing something that would get him (Eric) in trouble." *Id.*  Likewise, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████    This evidence confirms that it was at least reasonable for an outside

observer such as Leighton to have serious concerns about these issues.

In sum, the record contains ample evidence to support Leighton's suspicions

that the nurses at Rattigan's parties might have been prostitutes based upon reports

from others that Rattigan hosted wild parties attended by nurses.  Although Rattigan

may believe that Leighton's suspicions were unreasonable, he has provided no

evidence showing that Leighton "actually knew at the time of the reporting that the

information he provided was actually false."  *Rattigan II*, 689 F.3d 770.

## II.  THE DISTRICT COURT CORRECTLY HELD THAT A REASONABLE JURY COULD NOT PROPERLY FIND THAT RETALIATORY ANIMUS WAS THE BUT-FOR CAUSE OF PLAINTIFF'S REFERRAL TO THE SECURITY DIVISION.

In the prior appeal, this Court repeatedly recognized that Rattigan might

ultimately be unable to proceed on his novel retaliation claim without "running into

*Egan*" and specifically held that the district court would be in the best position to

decide that issue.  *See, e.g., Rattigan I*, 643 F.3d at 989.  The district court has now

properly performed the gatekeeping function assigned to it by this Court.  Specifically,

the court held that, for a number of reasons, Rattigan could not establish that

retaliation was the "but-for" cause of the referral without impermissibly second-guessing security-related judgments protected under *Egan*.

Rattigan challenges the district court's alternative holding on two grounds. First, he argues that the district court erred in applying *Nassar* because there was sufficient evidence for a reasonable jury to conclude that retaliation was the "but-for" cause of the referral to the Security Division. Pl. Br. 43-49. Second, he argues that the district court erred in concluding that it would be impossible for a jury to determine that the referral – which raised security concerns that this Court has found were not knowingly false, and that the Security Division recognized were significant – without violating *Egan*. *Id.* at 49-53. Neither argument has any merit.

1. As the district court explained, and Rattigan concedes on appeal, the Supreme Court's decision in *Nassar* clarified that "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action." *Nassar*, 133 S. Ct. at 2534. In overruling decisions allowing plaintiffs to pursue retaliation claims under Title VII premised on a "mixed motive" theory, *Nassar* thus further narrowed the already limited retaliation claim Rattigan might have pursued on remand. As the district court summarized, prior to *Nassar*, "it might have been possible for a jury to find liability for decisions based on a mixture of legitimate and illegitimate considerations because this mixture would show that retaliatory animus was a motivating factor," but now "such an approach is prohibited." JA 628. Thus, because Rattigan "concedes that the referral includes true

44

statements that raised legitimate security concerns," the district court held that the most a jury could find is that the motives for the referral were mixed.  *Id.*

In his opening brief, Rattigan does not dispute that *Nassar* now precludes "mixed motive" retaliation claims and thus narrowed the legal theory available to him on remand.  Instead he argues that *Nassar* did not impose a "sole cause" standard.  Pl. Br. 45-46 (citing *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013)).  But this argument attacks a straw man, as the district court did not apply a "sole cause" standard.  The court simply concluded that Rattigan would not be able to show that the referral would not have been made "but for" the isolated statements alleged to have been false given the presence of many legitimate security concerns.  JA 628.

Rattigan nowhere explains how a jury could properly find that the referral was the product of anything more than "mixed" motives.  Instead, he relies on the jury's *prior* finding of retaliation, insisting that "a reasonable jury could find – in fact, *did find* – that the EC would not have been referred but-for retaliatory motive."  Pl. Br. 47 (emphasis in the original).  This argument is flawed on multiple levels.  As an initial matter, this Court vacated the jury's prior verdict because it violated *Egan*, and Rattigan's reliance on that verdict simply underscores his continued refusal to accept the substantial limitations this Court placed on his claim in light of *Egan*.  Moreover, the adverse action at issue at the trial was the initiation of the Security Division's investigation, not the referral of Leighton's EC.

Rattigan also cites cases from other circuits for the propositions that determining "but for" causation is a fact-intensive question ill-suited for resolution on summary judgment, Pl. Br. 46 (citing *Zann*, 737 F.3d at 846 n.5), and that but-for causation may properly be established through a "convincing mosaic" of circumstantial evidence, *id.*. at 8 (citing *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013)).  Neither observation advances his arguments in this unique context, where the jury is not permitted to infer retaliatory motive through the normal combination of temporal proximity and suspicions that the reasons the employer has given for its actions are a pretext for retaliation.  Instead, the only permissible basis for inferring that the EC was referred for retaliatory reasons is the inclusion of statements that relevant FBI officials knew to be false, and even if Rattigan could make such a showing (which he cannot, *see* Section I), he would still have to show that the EC would not have been referred but-for those false statements.  As the district court recognized, however, the presence of uncontested, legitimate security concerns in the EC precludes any such showing.

Although Rattigan conceded that *Nassar* applies to his retaliation claim both in district court and in his opening brief in this Court, he filed a supplemental authority letter on August 25, 2014 citing a decision by the EEOC which suggested in a footnote that *Nassar* does not apply to federal-sector retaliation claims because of differences in the relevant statutory language.  *See Petitioner v. Dep't of the Interior*, 2014 WL 3788011 (EEOC 2014).  It is not clear whether Rattigan now intends to argue

that *Nassar* does not apply to this case, but that argument is plainly waived given his failure to advance it at any point in district court or in his opening brief in this Court. *See Petit v. U.S. Dept. of Educ.*, 675 F.3d 769, 779 (D.C. Cir. 2012).  In any event, this belated argument is squarely foreclosed by this Court's decision in *Rattigan I*, which cited *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006), for the proposition that "the federal government faces the same standards of liability for retaliation under Title VII as a private employer."  *Rattigan I*, 643 F.3d at 986.[8]

2.  Rattigan also argues (Pl. Br. 49-53) that the district court erred in concluding that his claim could not proceed without running afoul of *Egan*.  The court gave three reasons for this conclusion.  First, the court stressed that "if the jury were to evaluate whether the reason the EC was referred was retaliation, that assessment would necessarily allow the jury to second-guess the Security Division's conclusion, as testified by Shubert, that the issue of foreign influence warranted further

---

[8] Were this Court to conclude, contrary to *Rattigan I* and *Rochon*, that Title VII's private-sector retaliation provision, 42 U.S.C. § 2000e-3, does not apply to the federal government, as Rattigan now suggests, it would likewise need to re-assess the premise implicit in this case and others that the less-demanding "material adverse action" standard articulated in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), applies here.  *See Rattigan I*, 643 F.3d at  986-87.  Unlike the private-sector retaliation provision, which contains no textual limitation on the types of acts that may be challenged, the federal-sector retaliation provision, 42 U.S.C. § 2000e-16, only authorizes claims challenging "personnel actions," and the allegedly false reporting of security concerns at issue here would likely not qualify under that more demanding standard.  In short, if *Nassar* does not apply to federal sector retaliation claims because of the different language in 42 U.S.C. § 2000e-16, then *Burlington* would be inapplicable for the very same reason.

investigation." JA 625. Second, the court explained that "a reasonable jury should not be permitted to parse the EC," because "where facts present enough information to justify a security investigation, a jury may not be permitted to find that the real motive for some statements was not, as the Security Division concluded, legitimate security concerns." JA 626. Finally, the court concluded that "it is not possible based on the record in this case for a jury to find that plaintiff's alleged damages resulted from the referral of the EC, as opposed to the investigation itself." *Id.*

Rattigan contends that "[t]hese conclusions are all wrong because they turn the issue on its head." Pl. Br. 50. What he appears to mean by this is that a jury could potentially find the referral was retaliatory without second-guessing protected judgments by the Security Division. As the district court recognized, however, the two inquiries cannot be segregated, particularly where it is undisputed that the EC raised legitimate security concerns warranting referral to the Security Division even absent the isolated statements in the EC that this Court allowed Rattigan to attempt to show were knowingly false. Indeed, Edward Shubert, the head of the Security Division at the time, testified that the Security Division investigation was based on a combination of "foreign influence" and "personal conduct" issues. JA 292-95. Thus, even assuming Leighton's concerns about wild parties and "nurses" who were really prostitutes formed the core of the "personal conduct" issues of interest to the Security Division (and were knowingly false), the "foreign influence" concerns alone provided a sufficient basis to warrant further investigation. Any attempt to determine

48

the relative significance of these concerns in isolation would involve an impermissible inquiry into the judgments of the Security Division.

Rattigan also argues (Pl. Br. 51-53) that the district court erred in holding that a jury would be unable to find that his damages flowed from the referral as opposed to the Security Division's investigation.  As the court explained, however, "a jury cannot realistically be expected to perform the mental gymnastics of determining what damages were caused by the referral and what were caused by the investigation."  JA 627.  Rattigan does not even attempt to distinguish between damages flowing from the referral and those flowing from the Security Division's investigation; he simply claims that the former caused the latter.  *See* Pl. Br. 52 (arguing that damages flowing from the investigation are compensable).  But this causal chain depends upon an impermissible determination that the Security Division would not have initiated an investigation absent the elements of Leighton's EC alleged to be false.  Thus, as the district court recognized, Rattigan's claim is foreclosed not merely by *Nassar* but by *Egan* because it requires a prohibited assessment of Security Division judgments.

## III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING RATTIGAN'S REQUESTS FOR BROAD NEW DISCOVERY.

After giving Rattigan ample opportunities to identify specific discovery needed to pursue the narrow issues identified in this Court's remand order, the district court held that none of the discovery identified in the affidavit filed by Rattigan's counsel under Fed. R. Civ. P. 56(d) was necessary to rule on the government's summary

judgment motion.   JA 629-31.  The court explained that Rattigan's requests for

sweeping discovery strayed "far beyond the scope of the narrow question presented

on remand."  JA 630.  Noting that Rattigan had every opportunity and incentive to

explore "what Pyszczymuka knew or did not know during prior discovery and at

trial," the court concluded that further discovery regarding alleged false statements by

Leighton was unnecessary not only because he was not Rattigan's supervisor but also

because a jury could "at most" find that the motive for the referral was "mixed,"

which is no longer sufficient to support a claim of retaliation under *Nassar*.  JA 630.

Rattigan argues (Pl. Br. 54-58) that the district court abused its discretion in

denying his requests for sweeping discovery to augment the already-voluminous trial

record in this case.  As explained above, however, the court acted well within its

considerable discretion in concluding that none of the broad areas of discovery

proposed by Rattigan was necessary to resolve the narrow claim presented on remand.

Rattigan identifies no legal error in the court's analysis except to argue that the court's

"denial of additional discovery regarding Leighton and his relationship with the OIO

management" was predicated on the erroneous view that it "was unnecessary because

Leighton was not Rattigan's supervisor."  Pl. Br. 56.  As explained in Section I.A.,

*infra*, the court correctly held that Leighton's knowledge was irrelevant for purposes of

holding the FBI vicariously liable.  But in any event Rattigan failed to specifically

identify any specific new inquiry regarding Leighton's knowledge that was likely to

yield any new information relevant to the narrow question presented on remand.  On

the contrary, the court noted, the Rule 56(d) declaration continued to request discovery to determine what Leighton and various OIO supervisors "knew or should have known" – an inquiry far beyond the issue this Court identified. JA 631 n.11.

On appeal, Rattigan continues to advance arguments for discovery beyond the scope of the limited knowing falsity inquiry permitted by this Court. For example, Rattigan contends that the district court recognized his argument that Leighton's OIO supervisors used him to retaliate against Rattigan, but then denied discovery on this issue after concluding that Rattigan failed to identify any evidence to support this claim. Pl. Br. 56-57 (citing JA 623 n.7). But the district court's entire discussion of this issue occurs in a footnote following the court's conclusion that allowing an inquiry into whether Leighton made statements "on behalf and at the behest of" his supervisors would transform the "knowing falsity standard" into the pretext standard that this Court rejected in *Rattigan II*. JA 623. In short, the district court rejected Rattigan's argument that this was a legally relevant inquiry; it did not deny discovery on an issue it acknowledged was relevant.

None of Rattigan's other arguments fare any better. For example, he suggests that the district court's conclusion that no further discovery regarding Pyszczymuka's knowledge was necessary cannot be squared with this Court's prior decision stating that "Rattigan had little incentive to thoroughly develop evidence of knowing falsity in district court." *Rattigan II*, 689 F.3d at 773. But this Court did not purport to decide whether more discovery was necessary on any given issue, or whether Rattigan had in

fact "thoroughly developed" the evidence on this issue.  Instead, this Court remanded

for the district court to exercise its broad discretion to determine if "any" discovery is

necessary.  *Id.*  Likewise, Rattigan criticizes the district court for overlooking discovery

"he needed regarding the sealed exhibits that the Government relied on heavily in

moving for summary judgment."  Pl. Br. 57.  As explained above, however, the sealed

material the government relied upon is simply two affidavits filed by Rattigan himself

in unrelated disciplinary proceedings, and he nowhere explains why discovery

concerning his own prior statements would be necessary or appropriate.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

STUART F. DELERY
*Assistant Attorney General*
RONALD MACHEN
*United States Attorney*

 s/Charles W. Scarborough
MARLEIGH D. DOVER
CHARLES W.SCARBOROUGH
(202) 514-1927
*Attorneys, Appellate Staff*
*Civil Division*
*United States Department of Justice*
*950 Pennsylvania Ave., N.W., Rm. 7244*
*Washington, D.C. 20530-0001*

SEPTEMBER 2014

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App.

P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a

proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains 13,921 words, excluding the parts of the

brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.


 s/Charles W. Scarborough
CHARLES W. SCARBOROUGH

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2014, I electronically filed the foregoing public brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

    Jonathan C. Moore
    Joshua S. Moskovitz
    Beldock, Levine & Hoffman LLP
    99 Park Avenue, Suite 1600
    New York, NY 10016


                                        s/ Charles W. Scarborough
                                        CHARLES W. SCARBOROUGH

**ADDENDUM**

Executive Order No. 12,968 – "Access to Classified Information"



**Monday**
**August 7, 1995**

---

## Part IV

---

# The President

---

**Executive Order 12968—Access to Classified Information**

**Presidential Determination No. 95–32 of July 28, 1995**

**Presidential Determination No. 95–33 of July 31, 1995**

Federal Register

Vol. 60, No. 151

Monday, August 7, 1995

# Presidential Documents

Title 3—

**The President**

**Executive Order 12968 of August 2, 1995**

## Access to Classified Information

The national interest requires that certain information be maintained in confidence through a system of classification in order to protect our citizens, our democratic institutions, and our participation within the community of nations. The unauthorized disclosure of information classified in the national interest can cause irreparable damage to the national security and loss of human life.

Security policies designed to protect classified information must ensure consistent, cost effective, and efficient protection of our Nation's classified information, while providing fair and equitable treatment to those Americans upon whom we rely to guard our national security.

This order establishes a uniform Federal personnel security program for employees who will be considered for initial or continued access to classified information.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

### PART 1—DEFINITIONS, ACCESS TO CLASSIFIED INFORMATION, FINANCIAL DISCLOSURE, AND OTHER ITEMS

**Section 1.1.** *Definitions.* For the purposes of this order: (a) ''Agency'' means any ''Executive agency,'' as defined in 5 U.S.C. 105, the ''military departments,'' as defined in 5 U.S.C. 102, and any other entity within the executive branch that comes into the possession of classified information, including the Defense Intelligence Agency, National Security Agency, and the National Reconnaissance Office.

(b) ''Applicant'' means a person other than an employee who has received an authorized conditional offer of employment for a position that requires access to classified information.

(c) ''Authorized investigative agency'' means an agency authorized by law or regulation to conduct a counterintelligence investigation or investigation of persons who are proposed for access to classified information to ascertain whether such persons satisfy the criteria for obtaining and retaining access to such information.

(d) ''Classified information'' means information that has been determined pursuant to Executive Order No. 12958, or any successor order, Executive Order No. 12951, or any successor order, or the Atomic Energy Act of 1954 (42 U.S.C. 2011), to require protection against unauthorized disclosure.

(e) ''Employee'' means a person, other than the President and Vice President, employed by, detailed or assigned to, an agency, including members of the Armed Forces; an expert or consultant to an agency; an industrial or commercial contractor, licensee, certificate holder, or grantee of an agency, including all subcontractors; a personal services contractor; or any other category of person who acts for or on behalf of an agency as determined by the appropriate agency head.

(f) ''Foreign power'' and ''agent of a foreign power'' have the meaning provided in 50 U.S.C. 1801.

(g) ''Need for access'' means a determination that an employee requires access to a particular level of classified information in order to perform or assist in a lawful and authorized governmental function.

(h) ''Need-to-know'' means a determination made by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function.

(i) ''Overseas Security Policy Board'' means the Board established by the President to consider, develop, coordinate and promote policies, standards and agreements on overseas security operations, programs and projects that affect all United States Government agencies under the authority of a Chief of Mission.

(j) ''Security Policy Board'' means the Board established by the President to consider, coordinate, and recommend policy directives for U.S. security policies, procedures, and practices.

(k) ''Special access program'' has the meaning provided in section 4.1 of Executive Order No. 12958, or any successor order.

**Sec. 1.2.** *Access to Classified Information.* (a) No employee shall be granted access to classified information unless that employee has been determined to be eligible in accordance with this order and to possess a need-to-know.

(b) Agency heads shall be responsible for establishing and maintaining an effective program to ensure that access to classified information by each employee is clearly consistent with the interests of the national security.

(c) Employees shall not be granted access to classified information unless they:

(1) have been determined to be eligible for access under section 3.1 of this order by agency heads or designated officials based upon a favorable adjudication of an appropriate investigation of the employee's background;

(2) have a demonstrated need-to-know; and

(3) have signed an approved nondisclosure agreement.

(d) All employees shall be subject to investigation by an appropriate government authority prior to being granted access to classified information and at any time during the period of access to ascertain whether they continue to meet the requirements for access.

(e)(1) All employees granted access to classified information shall be required as a condition of such access to provide to the employing agency written consent permitting access by an authorized investigative agency, for such time as access to classified information is maintained and for a period of 3 years thereafter, to:

(A) relevant financial records that are maintained by a financial institution as defined in 31 U.S.C. 5312(a) or by a holding company as defined in section 1101(6) of the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401);

(B) consumer reports pertaining to the employee under the Fair Credit Reporting Act (15 U.S.C. 1681a); and

(C) records maintained by commercial entities within the United States pertaining to any travel by the employee outside the United States.

(2) Information may be requested pursuant to employee consent under this section where:

(A) there are reasonable grounds to believe, based on credible information, that the employee or former employee is, or may be, disclosing classified information in an unauthorized manner to a foreign power or agent of a foreign power;

(B) information the employing agency deems credible indicates the employee or former employee has incurred excessive indebtedness or has ac-

quired a level of affluence that cannot be explained by other information; or

(C) circumstances indicate the employee or former employee had the capability and opportunity to disclose classified information that is known to have been lost or compromised to a foreign power or an agent of a foreign power.

(3) Nothing in this section shall be construed to affect the authority of an investigating agency to obtain information pursuant to the Right to Financial Privacy Act, the Fair Credit Reporting Act or any other applicable law.

**Sec. 1.3.** *Financial Disclosure.* (a) Not later than 180 days after the effective date of this order, the head of each agency that originates, handles, transmits, or possesses classified information shall designate each employee, by position or category where possible, who has a regular need for access to classified information that, in the discretion of the agency head, would reveal:

(1) the identity of covert agents as defined in the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421);

(2) technical or specialized national intelligence collection and processing systems that, if disclosed in an unauthorized manner, would substantially negate or impair the effectiveness of the system;

(3) the details of:

(A) the nature, contents, algorithm, preparation, or use of any code, cipher, or cryptographic system or;

(B) the design, construction, functioning, maintenance, or repair of any cryptographic equipment; but not including information concerning the use of cryptographic equipment and services;

(4) particularly sensitive special access programs, the disclosure of which would substantially negate or impair the effectiveness of the information or activity involved; or

(5) especially sensitive nuclear weapons design information (but only for those positions that have been certified as being of a high degree of importance or sensitivity, as described in section 145(f) of the Atomic Energy Act of 1954, as amended).

(b) An employee may not be granted access, or hold a position designated as requiring access, to information described in subsection (a) unless, as a condition of access to such information, the employee:

(1) files with the head of the agency a financial disclosure report, including information with respect to the spouse and dependent children of the employee, as part of all background investigations or reinvestigations;

(2) is subject to annual financial disclosure requirements, if selected by the agency head; and

(3) files relevant information concerning foreign travel, as determined by the Security Policy Board.

(c) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop procedures for the implementation of this section, including a standard financial disclosure form for use by employees under subsection (b) of this section, and agency heads shall identify certain employees, by position or category, who are subject to annual financial disclosure.

**Sec. 1.4.** *Use of Automated Financial Record Data Bases.* As part of all investigations and reinvestigations described in section 1.2(d) of this order, agencies may request the Department of the Treasury, under terms and conditions prescribed by the Secretary of the Treasury, to search automated data bases consisting of reports of currency transactions by financial institutions, international transportation of currency or monetary instruments, foreign bank and financial accounts, transactions under $10,000 that are reported as possible money laundering violations, and records of foreign travel.

**Sec. 1.5.** *Employee Education and Assistance.* The head of each agency that grants access to classified information shall establish a program for employees with access to classified information to: (a) educate employees about individual responsibilities under this order; and

(b) inform employees about guidance and assistance available concerning issues that may affect their eligibility for access to classified information, including sources of assistance for employees who have questions or concerns about financial matters, mental health, or substance abuse.

## PART 2—ACCESS ELIGIBILITY POLICY AND PROCEDURE

**Sec. 2.1.** *Eligibility Determinations.* (a) Determinations of eligibility for access to classified information shall be based on criteria established under this order. Such determinations are separate from suitability determinations with respect to the hiring or retention of persons for employment by the government or any other personnel actions.

(b) The number of employees that each agency determines are eligible for access to classified information shall be kept to the minimum required for the conduct of agency functions.

(1) Eligibility for access to classified information shall not be requested or granted solely to permit entry to, or ease of movement within, controlled areas when the employee has no need for access and access to classified information may reasonably be prevented. Where circumstances indicate employees may be inadvertently exposed to classified information in the course of their duties, agencies are authorized to grant or deny, in their discretion, facility access approvals to such employees based on an appropriate level of investigation as determined by each agency.

(2) Except in agencies where eligibility for access is a mandatory condition of employment, eligibility for access to classified information shall only be requested or granted based on a demonstrated, foreseeable need for access. Requesting or approving eligibility in excess of actual requirements is prohibited.

(3) Eligibility for access to classified information may be granted where there is a temporary need for access, such as one-time participation in a classified project, provided the investigative standards established under this order have been satisfied. In such cases, a fixed date or event for expiration shall be identified and access to classified information shall be limited to information related to the particular project or assignment.

(4) Access to classified information shall be terminated when an employee no longer has a need for access.

**Sec. 2.2.** *Level of Access Approval.* (a) The level at which an access approval is granted for an employee shall be limited, and relate directly, to the level of classified information for which there is a need for access. Eligibility for access to a higher level of classified information includes eligibility for access to information classified at a lower level.

(b) Access to classified information relating to a special access program shall be granted in accordance with procedures established by the head of the agency that created the program or, for programs pertaining to intelligence activities (including special activities but not including military operational, strategic, and tactical programs) or intelligence sources and methods, by the Director of Central Intelligence. To the extent possible and consistent with the national security interests of the United States, such procedures shall be consistent with the standards and procedures established by and under this order.

**Sec. 2.3** *Temporary Access to Higher Levels.* (a) An employee who has been determined to be eligible for access to classified information based on favorable adjudication of a completed investigation may be granted temporary access to a higher level where security personnel authorized by the agency head to make access eligibility determinations find that such access:

(1) is necessary to meet operational or contractual exigencies not expected to be of a recurring nature;

(2) will not exceed 180 days; and

(3) is limited to specific, identifiable information that is made the subject of a written access record.

(b) Where the access granted under subsection (a) of this section involves another agency's classified information, that agency must concur before access to its information is granted.

**Sec. 2.4.** *Reciprocal Acceptance of Access Eligibility Determinations.* (a) Except when an agency has substantial information indicating that an employee may not satisfy the standards in section 3.1 of this order, background investi-gations and eligibility determinations conducted under this order shall be mutually and reciprocally accepted by all agencies.

(b) Except where there is substantial information indicating that the employee may not satisfy the standards in section 3.1 of this order, an employee with existing access to a special access program shall not be denied eligibility for access to another special access program at the same sensitivity level as determined personally by the agency head or deputy agency head, or have an existing access eligibility readjudicated, so long as the employee has a need for access to the information involved.

(c) This section shall not preclude agency heads from establishing additional, but not duplicative, investigative or adjudicative procedures for a special access program or for candidates for detail or assignment to their agencies, where such procedures are required in exceptional circumstances to protect the national security.

(d) Where temporary eligibility for access is granted under sections 2.3 or 3.3 of this order or where the determination of eligibility for access is conditional, the fact of such temporary or conditional access shall be conveyed to any other agency that considers affording the employee access to its information.

**Sec. 2.5.** *Specific Access Requirement.* (a) Employees who have been determined to be eligible for access to classified information shall be given access to classified information only where there is a need-to-know that information.

(b) It is the responsibility of employees who are authorized holders of classified information to verify that a prospective recipient's eligibility for access has been granted by an authorized agency official and to ensure that a need-to-know exists prior to allowing such access, and to challenge requests for access that do not appear well-founded.

**Sec. 2.6.** *Access by Non-United States Citizens.* (a) Where there are compelling reasons in furtherance of an agency mission, immigrant alien and foreign national employees who possess a special expertise may, in the discretion of the agency, be granted limited access to classified information only for specific programs, projects, contracts, licenses, certificates, or grants for which there is a need for access. Such individuals shall not be eligible for access to any greater level of classified information than the United States Govern-ment has determined may be releasable to the country of which the subject is currently a citizen, and such limited access may be approved only if the prior 10 years of the subject's life can be appropriately investigated. If there are any doubts concerning granting access, additional lawful investigative procedures shall be fully pursued.

(b) Exceptions to these requirements may be permitted only by the agency head or the senior agency official designated under section 6.1 of this order to further substantial national security interests.

# PART 3—ACCESS ELIGIBILITY STANDARDS

**Sec. 3.1.** *Standards.* (a) No employee shall be deemed to be eligible for access to classified information merely by reason of Federal service or con-

tracting, licensee, certificate holder, or grantee status, or as a matter of right or privilege, or as a result of any particular title, rank, position, or affiliation.

(b) Except as provided in sections 2.6 and 3.3 of this order, eligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel. Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security.

(c) The United States Government does not discriminate on the basis of race, color, religion, sex, national origin, disability, or sexual orientation in granting access to classified information.

(d) In determining eligibility for access under this order, agencies may investigate and consider any matter that relates to the determination of whether access is clearly consistent with the interests of national security. No inference concerning the standards in this section may be raised solely on the basis of the sexual orientation of the employee.

(e) No negative inference concerning the standards in this section may be raised solely on the basis of mental health counseling. Such counseling can be a positive factor in eligibility determinations. However, mental health counseling, where relevant to the adjudication of access to classified information, may justify further inquiry to determine whether the standards of subsection (b) of this section are satisfied, and mental health may be considered where it directly relates to those standards.

(f) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop a common set of adjudicative guidelines for determining eligibility for access to classified information, including access to special access programs.

**Sec. 3.2.** *Basis for Eligibility Approval.* (a) Eligibility determinations for access to classified information shall be based on information concerning the applicant or employee that is acquired through the investigation conducted pursuant to this order or otherwise available to security officials and shall be made part of the applicant's or employee's security record. Applicants or employees shall be required to provide relevant information pertaining to their background and character for use in investigating and adjudicating their eligibility for access.

(b) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop a common set of investigative standards for background investigations for access to classified information. These standards may vary for the various levels of access.

(c) Nothing in this order shall prohibit an agency from utilizing any lawful investigative procedure in addition to the investigative requirements set forth in this order and its implementing regulations to resolve issues that may arise during the course of a background investigation or reinvestigation.

**Sec. 3.3.** *Special Circumstances.* (a) In exceptional circumstances where official functions must be performed prior to the completion of the investigative and adjudication process, temporary eligibility for access to classified information may be granted to an employee while the initial investigation is underway. When such eligibility is granted, the initial investigation shall be expedited.

(1) Temporary eligibility for access under this section shall include a justification, and the employee must be notified in writing that further access is expressly conditioned on the favorable completion of the investigation and issuance of an access eligibility approval. Access will be immediately terminated, along with any assignment requiring an access eligibility approval, if such approval is not granted.

(2) Temporary eligibility for access may be granted only by security personnel authorized by the agency head to make access eligibility determinations and shall be based on minimum investigative standards developed by the Security Policy Board not later than 180 days after the effective date of this order.

(3) Temporary eligibility for access may be granted only to particular, identified categories of classified information necessary to perform the lawful and authorized functions that are the basis for the granting of temporary access.

(b) Nothing in subsection (a) shall be construed as altering the authority of an agency head to waive requirements for granting access to classified information pursuant to statutory authority.

(c) Where access has been terminated under section 2.1(b)(4) of this order and a new need for access arises, access eligibility up to the same level shall be reapproved without further investigation as to employees who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years, provided they have remained employed by the same employer during the period in question, the employee certifies in writing that there has been no change in the relevant information provided by the employee for the last background investigation, and there is no information that would tend to indicate the employee may no longer satisfy the standards established by this order for access to classified information.

(d) Access eligibility shall be reapproved for individuals who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years and who have been retired or otherwise separated from United States Government employment for not more than 2 years; provided there is no indication the individual may no longer satisfy the standards of this order, the individual certifies in writing that there has been no change in the relevant information provided by the individual for the last background investigation, and an appropriate record check reveals no unfavorable information.

**Sec. 3.4.** *Reinvestigation Requirements.* (a) Because circumstances and characteristics may change dramatically over time and thereby alter the eligibility of employees for continued access to classified information, reinvestigations shall be conducted with the same priority and care as initial investigations.

(b) Employees who are eligible for access to classified information shall be the subject of periodic reinvestigations and may also be reinvestigated if, at any time, there is reason to believe that they may no longer meet the standards for access established in this order.

(c) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop a common set of reinvestigative standards, including the frequency of reinvestigations.

## PART 4—INVESTIGATIONS FOR FOREIGN GOVERNMENTS

**Sec. 4.** *Authority.* Agencies that conduct background investigations, including the Federal Bureau of Investigation and the Department of State, are authorized to conduct personnel security investigations in the United States when requested by a foreign government as part of its own personnel security program and with the consent of the individual.

## PART 5—REVIEW OF ACCESS DETERMINATIONS

**Sec. 5.1.** *Determinations of Need for Access.* A determination under section 2.1(b)(4) of this order that an employee does not have, or no longer has, a need for access is a discretionary determination and shall be conclusive.

**Sec. 5.2.** *Review Proceedings for Denials or Revocations of Eligibility for Access.* (a) Applicants and employees who are determined to not meet the standards for access to classified information established in section 3.1 of this order shall be:

(1) provided as comprehensive and detailed a written explanation of the basis for that conclusion as the national security interests of the United States and other applicable law permit;

(2) provided within 30 days, upon request and to the extent the documents would be provided if requested under the Freedom of Information Act (5 U.S.C. 552) or the Privacy Act (3 U.S.C. 552a), as applicable, any documents, records, and reports upon which a denial or revocation is based;

(3) informed of their right to be represented by counsel or other representative at their own expense; to request any documents, records, and reports as described in section 5.2(a)(2) upon which a denial or revocation is based; and to request the entire investigative file, as permitted by the national security and other applicable law, which, if requested, shall be promptly provided prior to the time set for a written reply;

(4) provided a reasonable opportunity to reply in writing to, and to request a review of, the determination;

(5) provided written notice of and reasons for the results of the review, the identity of the deciding authority, and written notice of the right to appeal;

(6) provided an opportunity to appeal in writing to a high level panel, appointed by the agency head, which shall be comprised of at least three members, two of whom shall be selected from outside the security field. Decisions of the panel shall be in writing, and final except as provided in subsection (b) of this section; and

(7) provided an opportunity to appear personally and to present relevant documents, materials, and information at some point in the process before an adjudicative or other authority, other than the investigating entity, as determined by the agency head. A written summary or recording of such appearance shall be made part of the applicant's or employee's security record, unless such appearance occurs in the presence of the appeals panel described in subsection (a)(6) of this section.

(b) Nothing in this section shall prohibit an agency head from personally exercising the appeal authority in subsection (a)(6) of this section based upon recommendations from an appeals panel. In such case, the decision of the agency head shall be final.

(c) Agency heads shall promulgate regulations to implement this section and, at their sole discretion and as resources and national security considerations permit, may provide additional review proceedings beyond those required by subsection (a) of this section. This section does not require additional proceedings, however, and creates no procedural or substantive rights.

(d) When the head of an agency or principal deputy personally certifies that a procedure set forth in this section cannot be made available in a particular case without damaging the national security interests of the United States by revealing classified information, the particular procedure shall not be made available. This certification shall be conclusive.

(e) This section shall not be deemed to limit or affect the responsibility and power of an agency head pursuant to any law or other Executive order to deny or terminate access to classified information in the interests

of national security. The power and responsibility to deny or terminate access to classified information pursuant to any law or other Executive order may be exercised only where the agency head determines that the procedures prescribed in subsection (a) of this section cannot be invoked in a manner that is consistent with national security. This determination shall be conclusive.

(f)(1) This section shall not be deemed to limit or affect the responsibility and power of an agency head to make determinations of suitability for employment.

(2) Nothing in this section shall require that an agency provide the procedures prescribed in subsection (a) of this section to an applicant where a conditional offer of employment is withdrawn for reasons of suitability or any other reason other than denial of eligibility for access to classified information.

(3) A suitability determination shall not be used for the purpose of denying an applicant or employee the review proceedings of this section where there has been a denial or revocation of eligibility for access to classified information.

## PART 6—IMPLEMENTATION

**Sec. 6.1.** *Agency Implementing Responsibilities.* Heads of agencies that grant employees access to classified information shall: (a) designate a senior agency official to direct and administer the agency's personnel security program established by this order. All such programs shall include active oversight and continuing security education and awareness programs to ensure effective implementation of this order;

(b) cooperate, under the guidance of the Security Policy Board, with other agencies to achieve practical, consistent, and effective adjudicative training and guidelines; and

(c) conduct periodic evaluations of the agency's implementation and administration of this order, including the implementation of section 1.3(a) of this order. Copies of each report shall be provided to the Security Policy Board.

**Sec. 6.2.** *Employee Responsibilities.* (a) Employees who are granted eligibility for access to classified information shall:

(1) protect classified information in their custody from unauthorized disclosure;

(2) report all contacts with persons, including foreign nationals, who seek in any way to obtain unauthorized access to classified information;

(3) report all violations of security regulations to the appropriate security officials; and

(4) comply with all other security requirements set forth in this order and its implementing regulations.

(b) Employees are encouraged and expected to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security.

**Sec. 6.3.** *Security Policy Board Responsibilities and Implementation.* (a) With respect to actions taken by the Security Policy Board pursuant to sections 1.3(c), 3.1(f), 3.2(b), 3.3(a)(2), and 3.4(c) of this order, the Security Policy Board shall make recommendations to the President through the Assistant to the President for National Security Affairs for implementation.

(b) Any guidelines, standards, or procedures developed by the Security Policy Board pursuant to this order shall be consistent with those guidelines issued by the Federal Bureau of Investigation in March 1994 on Background Investigations Policy/Guidelines Regarding Sexual Orientation.

(c) In carrying out its responsibilities under this order, the Security Policy Board shall consult where appropriate with the Overseas Security Policy Board. In carrying out its responsibilities under section 1.3(c) of this order, the Security Policy Board shall obtain the concurrence of the Director of the Office of Management and Budget.

**Sec. 6.4.** *Sanctions.* Employees shall be subject to appropriate sanctions if they knowingly and willfully grant eligibility for, or allow access to, classified information in violation of this order or its implementing regulations. Sanctions may include reprimand, suspension without pay, removal, and other actions in accordance with applicable law and agency regulations.

## PART 7—GENERAL PROVISIONS

**Sec. 7.1.** *Classified Information Procedures Act.* Nothing in this order is intended to alter the procedures established under the Classified Information Procedures Act (18 U.S.C. App. 1).

**Sec. 7.2.** *General.* (a) Information obtained by an agency under sections 1.2(e) or 1.3 of this order may not be disseminated outside the agency, except to:

(1) the agency employing the employee who is the subject of the records or information;

(2) the Department of Justice for law enforcement or counterintelligence purposes; or

(3) any agency if such information is clearly relevant to the authorized responsibilities of such agency.

(b) The Attorney General, at the request of the head of an agency, shall render an interpretation of this order with respect to any question arising in the course of its administration.

(c) No prior Executive orders are repealed by this order. To the extent that this order is inconsistent with any provision of any prior Executive order, this order shall control, except that this order shall not diminish or otherwise affect the requirements of Executive Order No. 10450, the denial and revocation procedures provided to individuals covered by Executive Order No. 10865, as amended, or access by historical researchers and former presidential appointees under Executive Order No. 12958 or any successor order.

(d) If any provision of this order or the application of such provision is held to be invalid, the remainder of this order shall not be affected.

(e) This Executive order is intended only to improve the internal management of the executive branch and is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit or trust responsibility, substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

(f) This order is effective immediately.

*William J. Clinton*

THE WHITE HOUSE,
*August 2, 1995.*

[FR Doc. 95–19654

Filed 8–4–95; 12:18 pm]

Billing code 3195–01–P